COLUMBIA PLAZA TENANTS ASSOCI-
ATION, INC., Appellant,

v.

D.F. ANTONELLI, Jr., et al., Appellees.

No. 80–189.

District of Columbia Court of Appeals.

Argued Jan. 5, 1982.
Decided June 2, 1983.

**434**

Michael Nussbaum, Washington, D.C., with whom Lucien Hilmer and Kate A. Martin, Washington, D.C., were on the brief, for appellants.

Robert B. Hirsch, Washington, D.C., with whom Daniel M. Clements, Columbia, Md., was on the brief, for appellees. David R. Kuney, Washington, D.C., entered an appearance on behalf of appellee Daon Corp.

Before NEBEKER, FERREN and BELSON, Associate Judges.

NEBEKER, Associate Judge:

Appellant challenges the trial court's ruling in a consolidated, non-jury action involving the conveyance of certain real property, namely the Columbia Plaza Apartments. Two parties, the Columbia Plaza Tenants Association (hereinafter "CPTA") and the "Daon-Cadillac" Joint Venture (hereinafter "Daon") each sought the property. The trial court ruled that Daon was entitled to the apartments under a written contract negotiated with the owners of the real property, where the tenant organization had failed to timely negotiate a contract as provided in pertinent portions of the D.C. Rental Accommodations Act of 1977.[1] Finding no error, we affirm.

## I

Columbia Plaza is a five-building complex containing 800 apartments, parking for 1,000 vehicles, and commercial and office space. The complex is owned by the Co-

---

1. *See* D.C.Code §§ 45–1631 through 1641 (1981).

lumbia Plaza Limited Partnership whose general partners are appellees Dominic F. Antonelli, Lazlow M. Tauber, and Edward Mernone (hereinafter "Owners"). In early December of 1978, the tenants of the complex were informed of the Owners' interest in selling the apartments. Approximately 650 residential tenants of the complex then formed the Columbia Plaza Tenants Association, the CPTA, and in January 1979 the Association retained Benny Kass, Esq., as counsel. Mr. Kass had substantial prior experience assisting tenant associations in purchasing their buildings when faced with condominium conversion.

Under § 602(b) of the Rental Accommodation Act of 1977 (hereinafter "Act"), tenant associations which are eligible to own property are entitled to have an opportunity to purchase their building.[2] The section states, *inter alia,* that landlords who intend to sell their apartment buildings must provide eligible tenant organizations with "a written notice of intent to sell" and "an opportunity to purchase their housing accommodations at a price which presents a bona fide offer of sale." *See* D.C.Code §§ 45–1631, –1632 (1981). In order to establish the Association's eligibility under the Act, Mr. Kass immediately filed its Articles of Incorporation. *See* D.C.Code § 45–1640 (1981).[3]

Going forward with their plans, the Owners entered into a contract to sell the property with Daon-Cadillac, a joint venture, on March 18, 1979. The contract was unusual in the District of Columbia and quite complex, because only the residential units and common areas of the buildings were to be sold. The Owners were to retain the land, the commercial segments of the complex, and the parking areas, all of which they would lease back to Daon. The sale price was $50,000,000 plus $600,000 per year in ground rent. Because Daon intended to convert the apartments to condominium ownership, the contract expressly provided that it was subject to the tenants' rights under the Act. Similarly, Daon's obligation to go to settlement was conditioned upon the expiration of the tenants' rights under the Act. Apprised of the contract negotiations with Daon, Mr. Kass met with the

---

2. Amended Section 602(b) states in pertinent part:

> A landlord of a housing accommodation comprised of two (2) or more rental units may sell it to a purchaser but only after the landlord has done the following:
>
> \* \* \* \* \* \*
>
> (b) in the case of a housing accommodation comprised of more than four (4) units, given the organization of tenants with the legal capacity to hold real estate an opportunity to purchase the housing accommodation at a price which represents a bona fide offer of sale. The landlord shall give to the tenants a written notice of intent to sell. The notice shall include, but not be limited to, the asking price for the housing accommodation and a statement of the tenants' right to purchase the housing accommodation under section 602 of this act. If at the time of receipt of the notice no eligible organization of tenants exists, the tenants shall be afforded at least thirty (30) days therefrom in which to form an organization of tenants with the legal capacity to hold real estate. An eligible organization of tenants shall be given at least ninety (90) days in which to contract with the landlord for the purchase of the housing accommodation at a mutually agreeable price

and under mutually agreeable terms. If upon tenants' receipt of landlord's notice of intent to sell there exists an eligible organization of tenants, the contracting period shall commence upon receipt thereof. If no eligible organization of tenants exists at such time, the contracting period shall commence, if at all, immediately after expiration of the thirty (30) day period afforded tenants to organize. A landlord shall not require the organization to pay an earnest-money deposit of more than five percent (5%) of the sales price. Earnest-money deposits pursuant to this subsection shall be refundable in the event of any good-faith failure of the organization to perform under the contract. (25 D.C.Reg. 875 and 10080–81.)

*See* D.C.Law 2–118, 24 D.C.Reg. 5334 (December 30, 1977), as amended by E.A. 3–15, 25 D.C.Reg. 8787 (March 23, 1979); E.A. 3–53, 25 D.C.Reg. 10880 (June 22, 1979); E.A. 3–90, 26 D.C.Reg. 986 (August 31, 1979); E.A. 3–16, 25 D.C.Reg. 8793 (March 23, 1979); E.A. 3–54, 25 D.C.Reg. 10886 (June 22, 1979); E.A. 3–96, 26 D.C.Reg. 1022 (August 31, 1979).

3. The members did not pass their by-laws and thus become fully incorporated as required by the Act until May 29, 1979. *See* D.C.Code § 45–1640 (1981).

Owners' counsel in April and requested a copy of the proposed contract. He stated that he needed the contract to provide the tenants with a starting point for their negotiations. Although he did not receive the contract at that meeting (revisions were being negotiated), he was told that the Owners would sign no contract with the CPTA which contained a financial contingency.

On May 3, 1979, the Owners sent the tenants a Notice of Intent to Sell. *See* D.C.Code § 45–1632 (1981). The six-page document described the buildings to be sold, the ground lease, the tenants' rights under § 602(b), and the intent of Daon to convert the apartments to condominiums. It set forth the $50,000,000 asking price and the annual $600,000 ground rent. The notice also stated that, upon receipt of specified documents from the CPTA, "the Owners will make a bona fide offer for the sale of the buildings and the leasing of the land to the eligible tenants association, as required by § 602(b) of the Act." On May 29, the CPTA became fully incorporated and thus eligible to own property, and the requested documents were sent to the Owners.[4]

The Owners and Daon debated between themselves the appropriate way to communicate the substance of the Owners' written contract with Daon to the CPTA. On June 15, the Owners chose to deliver a verbatim copy of the Daon contract. They submitted no other contract draft to the CPTA. It was agreed by all parties that the statutory 90-day period for the CPTA to contract with the Owners would extend until at least September 10, 1979.[5]

Since the Owners stated in unequivocal terms that they would accept no contract from the CPTA which included a financing contingency, the CPTA attempted to obtain the services of a developer to aid in their search for financing. They negotiated with M & Z Properties during the summer months; however, until early August, there were no substantive contract negotiations between the CPTA and the Owners. Mr. Kass then left on a business trip, and on August 3, 1979, Mr. Arthur Content was retained as the CPTA's counsel, with directions to negotiate a contract with the Owners. He met with the Owners' counsel on the next day to discuss the Daon contract, and was informed that the Owners would not offer the CPTA a contract identical to that offered Daon.

Specifically, the Owners' counsel stated that the CPTA would not receive the same representation and warranties, particularly those concerning the physical condition of the buildings. Daon's attorney valued these warranties, in the third party contract, at $2,000,000.[6] Instead, the Owners stated that their liability under any such warranties to the CPTA would be limited to $500,000 reduced by $8,333 a day for each day that closing might be postponed. Additionally, the Owners' counsel reiterated that the Owners would sign no contract with CPTA without first receiving assurances that it had the financial ability to perform the contract.

The following day, Mr. Content left for a two week vacation, instructing his associate to finalize the agreement with the developer and to draft a purchase contract for the CPTA. An agreement was reached with M & Z Properties, and on August 28 the CPTA delivered its first draft contract to the Owners. The Owners, however, found the draft unsatisfactory. The parties discussed the disputed provisions during the following week, and on September 10, the CPTA tendered a "final" signed contract together

---

4.  *See* note 3, *supra.*

5.  *See* note 2, *supra.* "An eligible organization of tenants shall be given at least *ninety (90) days* in which to contract with the landlord for the purchase of the housing accommodation at a mutually agreeable price and under mutually agreeable terms." (Emphasis added.)

6.  The Daon contract contained numerous warranties: that the buildings were watertight; and that at closing the buildings' mechanical, plumbing, heating, air conditioning, and other systems and equipment would be structurally sound and in good working order.

with a letter from the American Security Bank stating that $2,500,000 (five percent of the purchase price) was on deposit and available upon the Owners' acceptance of the contract. *See* D.C.Code § 45–1634(b) (1981). On September 11, the Owners rejected the contract,[7] reasoning as follows. They claimed that (1) despite their statements to the CPTA, the CPTA's contract contained the same warranties as the Daon contract, (2) the CPTA had failed to produce proof of its financial ability to close, and (3) the settlement provision was unacceptable.[8] After brief and fruitless further negotiations, the CPTA filed suit alleging, *inter alia,* that the owners violated their statutory obligation by reneging on their offer and by failing to negotiate in good faith. The CPTA sought to enjoin conveyance of the property under the Daon contract.

Holding that the Owners satisfied all requirements under § 602(b) of the Act, the trial court concluded that the Owners had acted in good faith. Pertinent to disposition of this appeal, the trial court found that the Daon contract was transmitted to the CPTA to provide a "blueprint" from which the parties could begin negotiations, and "the failure to reach mutually agreeable terms within the given period can be blamed primarily on the tenants for their failure to act expeditiously." The trial court further stated that "[n]egotiating in good faith within the context of § 602(b) requires only that the demands of the owners be reasonable in light of the third party contract."

The CPTA contends on appeal that the trial court erred when it found that the owners negotiated in good faith. Specifically, the CPTA argues that the Owners constructively withdrew their offer, as represented by the third party contract, in bad faith, when they sought several contract concessions from the CPTA. Most importantly, the Owners reduced their representations and warranties from the $2,000,000 offered Daon to the $500,000 offered the CPTA; and the Owners insisted upon proof of financial capacity to close, independent of the statutory deposit.[9]

## II

■ Section 602(b) states that a landlord must provide eligible tenant organizations with "an opportunity to purchase the housing accommodation at a price which represents a bona fide offer of sale." *See* D.C. Code § 45–1631 (1981). Further, the landlord must provide the tenant association with "at least ninety days in which to contract with the landlord for the purchase of the housing accommodation at a mutually agreeable price and under mutually agreeable terms." Although this statute is in derogation of the common law and therefore must be strictly construed, good faith on the part of the Owners must be deemed to be implied lest the statute become illusory.

■ We find no error when the trial court stated that delivery of a copy of the Daon contract provided a "blueprint" for the ninety-day negotiation period. It did not permit the CPTA a right of first refusal on those precise terms.[10] Neither, however, did it absolve the partnership from respon-

---

**7.** At trial, the Owners testified that they did not read or evaluate the contract beyond the enumerated objections. *See infra.*

**8.** The CPTA requested settlement on or before January 31, 1980, with the right to extend the closing to March 31, 1980. If litigation were to delay the closing further, closing would be held thirty days after final resolution provided that the CPTA retained the right to terminate the agreement.

**9.** The CPTA complains of other contract changes, including an increase in the dollar

amount of allowable unrepaired damages, and more favorable terms for the Owners' purchase of ten units in the complex. However, we think the two enumerated changes are the only ones that arguably so affect the contract as to show bad faith.

**10.** We do not think it can be said that this is all the CPTA wanted, for in its own contract drafts the CPTA changed contract provisions to its own advantage.

sibility for good faith negotiation. We think, perhaps, the trial court overstated the statutory authority for the Owners, during the negotiations, to move away from the "blueprint" to different terms. If the CPTA's right to purchase under the Act is to have any meaning, the third party contract must be very close, in its terms and substance, to that which the sellers are willing to accept from the CPTA. Both the intent of the Act and the implicit requirement of good faith negotiation urge this.

■ We cannot hold that a landlord has fulfilled his statutory responsibilities by simple presentation of a signed third party contract. The ninety-day negotiation period, in which the parties must reach "mutually agreeable terms," has as its focus the terms of the third party contract. It is against this backdrop that we must assess the sought after variations on the terms of the Daon contract, and their effect on the Owners' asserted good faith in negotiation.

### III

Dispositive of this case on appeal is our interpretation of § 602(b) of the Act. However, at the outset, we are faced with the question of whether to apply the provisions of § 602(b) as drafted [11] or as amended.[12] The differences are not insignificant.[13]

Section 602(b) itself was amended by the Emergency Multi-family Rental Housing Purchase Act of 1977, D.C. Act 2–314. The original ninety-day life of this legislation, in fact, expired prior to the signing of the third party contract between the Owners and Daon, and successive enactments of the legislation in emergency garb were declared invalid in *District of Columbia v. Washington Home Ownership Council, Inc.,* 415 A.2d 1349 (D.C.1980) (en banc). There we affirmed the trial court's ruling that subsequent enactments of substantially identical emergency legislation violated the Home Rule Act.[14] It is therefore urged that *amended* § 602(b) was invalid at the time the CPTA was negotiating with the Owners.[15] The CPTA responds that, even if this is so, both sides conducted themselves fully as if amended § 602(b) controlled the negotiations. Therefore, we should still apply the terms of the amended version.

Without resolving the dispute, we may assume, *arguendo,* that the amended version was applicable to the negotiations between the Owners and the CPTA; for, upon analysis, we think the CPTA's claims must fail under even the more favorable provisions of the amended § 602(b).

11. Original § 602(b) of the Rental Housing Act of 1977 stated:

    A landlord of a housing accommodation comprised of two (2) or more rental units may sell it to a purchaser but only after the landlord has done the following:

    \*    \*    \*    \*    \*    \*

    (b) in the case of a housing accommodation comprised of more than four (4) rental units, and which has an organization of tenants with the legal capacity to hold real estate, who have previously indicated an interest in purchasing the housing accommodation, given the tenants an opportunity to purchase the housing accommodation at a price which represents a bona fide offer of sale. A written notice of intent to sell shall be given to the tenants by the landlord. The notice shall include, but not be limited to, the asking price for the housing accommodation and a statement of the tenants' right to purchase the housing accommodation under the provision of section 602 of this act. The tenants shall be afforded at least forty-five (45) days in which to contract with the landlord for the purchase of the housing accommodation at a mutually agreeable price and under mutually agreeable terms.
    *See* D.C.Law 2–118, 24 D.C.Reg. 5334, 5397–98 (December 30, 1977).

12. *See* note 2, *supra.*

13. The law as amended does not require that a tenant organization express an interest in purchasing the building prior to the landlord's notice of intent to sell. It provides for a ninety-day negotiating period and not the original forty-five days. Finally, it established five percent of the purchase price as the maximum deposit which may be demanded by the landlord.

14. *See* D.C.Code § 1–229(a) (1981).

15. It cannot be strongly disputed that the CPTA would fail in this appeal under § 602(b) as originally drafted.

The CPTA's material contention is that by (1) insisting on proof of financial capacity to perform the contract and/or (2) substantially changing the value of the warranties from the third party contract, the Owners constructively withdrew the CPTA's statutory "opportunity to purchase" and demonstrated bad faith. We disagree.

■ As noted above, we agree with the trial court that the Owners' presentation of the third party contract satisfied their initial obligation to provide a blueprint from which contract negotiations might proceed. However, the Owners were not then at liberty to establish wholly unreasonable contract terms, so as to discourage the CPTA and prevent exercise of their statutory rights. Ultimately, we must assess the assertedly material changes in the contract terms in this light. It is against the third party contract, as a blueprint, that we evaluate the Owners' conduct.

We turn our attention to what we perceive to be the less troubling aspect of what the CPTA classifies as the Owners' two material alterations of their offer of sale.[16] Firstly, the CPTA urges, in effect, that the statutory requirement of a five percent earnest-money deposit by a tenant organization is the sum total of financial assurances that the Owners' may ask for and receive under the statutory scheme. *See* D.C.Code § 45–1634 (1981). We find this position unsupported by the Act and beyond the ken of the instant contract negotiations.

■ The Owners understandably sought financing assurances from the CPTA. The third party contract contained no financing contingency for Daon's performance; and it was not unreasonable, under the circumstances, for the Owners to have asked the CPTA for proof of capacity to perform. Cursory, common sense examination of the

potential repercussions to the Owners from the CPTA's default makes this apparent. Absent financial assurances, there was the risk that the Owners would be left "holding the bag"—out time, money, and most importantly the third party purchaser who had originally agreed to terms.

■ Further, the CPTA's claim demonstrates a misunderstanding of the purpose of the deposit provision within the Act. The five percent requirement is simply a legislative determination of the amount a tenant organization may be asked to "ante up" as a condition to the assertion of their statutory rights. It is not an exclusive exposition of the financial assurances an owner may reasonably seek from a tenant organization. Plainly, the five percent earnest-money deposit does not guarantee the CPTA's financial health. We hold that the Owners could seek financial assurances from the CPTA in good faith.

■ Another alteration in the terms of the third party contract was the proposed change in the value of the physical warranties, specifically the placing of a $500,000 cap on the value of the warranties to the CPTA. The $2,000,000 estimated value of the warranties in the Daon contract demonstrates the potential effect of this change on the overall worth of the contract. Nevertheless, the question remains whether such a change evidences bad faith or proves a constructive withdrawal of the CPTA's opportunity to purchase the complex. We hold it does not.

It cannot be denied that the Owners' warranty demand effects a significant change in the terms of the contract. However, when the proposed change is viewed in the context of the total negotiations between the parties,[17] it does not, as a matter of law (or fact on this record), evidence bad

---

16. We note, as stated in note 10, *supra,* that the tenants sought contract changes to their advantage, and in assessing the effect of the Owners' actions we cannot exclude the CPTA's actions from our review calculus.

17. Other tenant proposals of less favorable impact to the Owners were, for example: an open settlement date depending on tenant litigation; deposit and deposit fee differences; a difference in price for condominium units to be retained by the Owners; and parking operation.

faith or so directly affect the terms of the contract as to defeat the CPTA's statutory rights.

Briefly, we are persuaded that the Owners' justification for the change (the fear of "nitpicking" demands by 800 condominium owners) is fully supportable. It is not unreasonable to assume that individual tenants will subject their individual apartments to greater scrutiny than would a partnership purchasing the entire complex. Such scrutiny would inevitably lead to greater restoration and repair costs. This is ample justification for the Owners' reduced warranty offer. Certainly, in the full context of the "give and take" of the contract negotiations, it cannot be said that this change evidenced bad faith. It merely demonstrates the legitimately different concerns the Owners had in dealing with the CPTA as opposed to Daon. This contract demand did not evidence a disregard for statutory negotiation procedure.

In conclusion, we find no error in the holding that the Owners negotiated in good faith and presented the CPTA an opportunity to purchase at a price which represented a bona fide offer of sale. The changes in the contract sought by the Owners did not so materially alter the terms of the third party contract as to deprive the CPTA of its rights under § 602(b) as enacted or as amended.

*Affirmed.*