**LEALAND TENANTS ASSOCIATION, INC., Appellant,**

v.

**Joseph L. JOHNSON, et al., Appellees.**

**No. 88–1101.**

District of Columbia Court of Appeals.

Argued Jan. 24, 1990.

Decided March 28, 1990.

George R. Keys, Jr., with whom Harold E. Jordan and Mark M. Jones, Washington, D.C., were on the brief, for appellant.

Wendell P. Gardner, Jr., Washington, D.C., for appellees.

Benny L. Kass, Washington, D.C., filed a brief in behalf of Diane and Allen Weinstein, amici curiae.

Before FERREN, BELSON and TERRY, Associate Judges.

BELSON, Associate Judge:

Appellant Lealand Tenants Association seeks to enjoin appellees, owners of a six-unit apartment building, from selling the building to a third party. The trial court denied injunctive relief. We affirm.

On July 8, 1987, the owners delivered to their tenants an offer of sale pursuant to the Rental Housing Conversion and Sale statute.[1] As provided by statute, the tenants had 45 days to organize a tenant organization with legal capacity to hold real property. D.C.Code § 45–1640(1) (1986 Repl.). The offer of sale stated that the tenants would have a 120–day period (the minimum prescribed by D.C.Code § 45–1640(2)), measured from the owners' receipt of the tenant organization's registration statement, to negotiate a purchase. The only material terms[2] listed were a purchase price of $495,000 and a provision that the sale yield all cash to the owners. Pursuant to § 45–1634(b), the offer also provided that the tenant organization would be required to deposit no more than five percent of the purchase price.

On July 28, the owners executed a contract with Allen and Diane Weinstein for the sale of the apartment building. The terms included a purchase price of $495,000 and a $25,000 deposit. The Weinstein contract further contained a provision allowing for the suspension of the contract with a corresponding reduction in the deposit to $10,000 if the tenants decided to exercise their right to negotiate.

On August 5, the sellers received the tenant organization's registration statement, at which point the 120–day negotiation period referred to in the offer of sale commenced. This period was to end on December 4.

On August 29, the owners notified the tenant organization of the acceptance of the Weinstein contract. Because the tenant organization received notice of the third-party contract during the statutory negotiation period, a provision of D.C.Code § 45–1637 gave the tenant association a 15–day right of first refusal that would begin to run at the end of the negotiation period.

On November 24, ten days before the negotiation period specified by the owners was to end, the tenant organization submitted a contract which called for a purchase price of $495,000 and a $25,000 deposit, but differed from the Weinstein contract in several other respects. The owners gave no response until December 28, when owners' counsel informed the tenant organization's representative by letter that he had been unable to reach him by telephone and indicated the need to complete negotiations within five days. The owners' counsel and the representative of the tenant organization had their first meeting on January 15, 1988, at which time the owners' counsel enumerated a number of substantial objections to the tenant organization's contract proposal. On January 21, counsel for the owners met with new counsel for the tenant organization and discussed the owners' objections to the contract.[3] Owners' counsel then indicated that

1. D.C.Code § 45–1631 (1986 Repl.) provides:

Before an owner of a housing accommodation may sell the accommodation, or issue a notice of intent to recover possession, or notice to vacate, for purposes of demolition or discontinuance of housing use, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

2. D.C.Code § 45–1632(1) requires that the offer of sale list the asking price and material terms of sale.

3. The owners' objections to the tenant organization's contract included: the free assignability provision of paragraph 1 was in contravention of D.C.Code § 45–1635, which the owners contended limits assignment of rights to "an agency or instrumentality of the District or federal governments"; the wording of paragraph 3 relating to the amount of the balance of the purchase price to be paid at settlement was vague; paragraph 12 prohibited the owners from entering new leases from the date of ratification to closing; and paragraph 25 required the owner "to make every effort to assist Purchaser" in

the owners would not accept a contract with less than a $25,000 deposit and that any contract submitted must substantially conform to the price and other terms of the Weinstein contract.

On February 3, the tenant organization submitted a second contract with a $495,-000 purchase price and a $10,000 deposit. On February 19, the owners rejected the second contract, stating that it did not substantially conform to the price and terms of the Weinstein contract. The specific reason given by the owners for rejecting the contract was that it provided for a down payment of only $10,000, as contrasted with the $25,000 provided by the Weinstein contract. The tenant organization brought suit for declaratory and injunctive relief, on the ground that the tenant organization was being deprived of its statutory right to negotiate a purchase conforming to the terms of the offer of sale.

■■■ The trial court denied relief to the tenant organization. It ruled that the owners were entitled to reject the tenant organization's second contract submitted on February 3, 1988, because the negotiation period ended on December 4, 1987, and the 15–day right of refusal ended on December 19, 1987. We are persuaded that the trial court erred in its determination of when the negotiation period ended, but nonetheless affirm on other grounds. *See Purce v. United States*, 482 A.2d 772, 775 n. 6 (D.C.1984) ("appellate court may affirm a decision for reasons other than those given by the trial court"). We hold that the owners by their actions extended the negotiation period beyond the minimum 120 days required by statute, but that the owners terminated it on February 19, 1988, when they rejected the tenant organization's second contract. When the tenant organization did not thereafter exercise its 15–day right of first refusal, the owners became free to sell the apartment building to the Weinsteins.

D.C.Code § 45–1640(2) required the owners to give the tenant organization a reasonable period, not less than 120 days, to negotiate a contract of sale. This provision makes it clear that a reasonable period for negotiations may require more than 120 days. Here, although the tenant organization submitted a contract ten days before the end of the 120–day negotiation period, it did not receive any word from the owners until December 28, twenty-four days after the 120–day negotiation period was to end. The owners did not inform the tenant organization of their objections to the contract until they met for the first time on January 15. We are therefore persuaded that because the owners failed to respond to the tenant organization's contract proposal until after the end of the 120–day period, they in effect extended the statutorily required reasonable negotiation period.[4] To hold otherwise would enable owners to defeat the purpose of the statutorily required minimum of 120 days for negotiations simply by allowing the period to run its course without making a response.

D.C.Code § 45–1634 (1986 Repl.) explicitly requires the tenant and the owner to bargain in good faith. Here, once the owners by their actions extended the negotiation period, this good faith requirement made it impermissible for them not to give the tenant organization an opportunity to respond to their objections to the first contract proposal. We therefore conclude that the negotiation period did not end until February 19, the date that the owners rejected the tenant organization's second contract proposal.

■■■ We do not agree with the tenant organization's contention that it was impermissible for the owners to take into account any of the terms of the Weinstein contract in the course of negotiations during the statutorily required period, rather than consider only the owners' initial offer

---

converting the property to either a condominium or cooperative.

**4.** This is not to say that the tenant organization could have submitted a contract proposal on the 119th day and thereby forced an extension of the negotiation period. Although the tenant organization would have done better not to wait until the 110th day to submit its contract, a 10–day response period for the owners was not unreasonable.

of sale.[5]  As support for its argument, the tenant association cites D.C.Code § 45–1637 (1986 Repl.), which provides:

In addition to any and all other rights specified in this subchapter, a tenant or tenant organization shall also have the right of first refusal during the 15 days after the tenant or tenant organization has received from the owner a valid sales contract to purchase by a 3rd party.  If the contract is received during the negotiation period ... the 15–day period will begin to run at the end of the negotiation period.

In our view, however, a reasonable interpretation of D.C.Code § 45–1637 is that when a third-party contract is received by the tenant organization after negotiations have begun, it is at least permissible for the owners to ask for subsidiary terms— i.e., non-material terms [6]—similar to those offered by the third party.  If the owners, acting in good faith, and the tenant organization are still unable to reach an agreement at the end of the negotiation period, the third-party contract becomes primary, but the tenant organization has the protection of a 15–day right of first refusal.

■ We do not need to determine here whether during the negotiation period owners may use as a standard material terms in a third-party contract that differ substantially from the initial offer of sale.  Cf. Columbia Plaza Tenants Ass'n v. Antonelli, 462 A.2d 433, 440 (D.C.1983) (where the terms of third-party contract constituted the initial offer of sale, the owners could not demand terms that materially differed from the third-party contract).  In this case, the Weinstein contract was identical to the only material terms set forth in the owners' offer, i.e., the basic provision for the purchase price, and that the sale yield all cash to the owners.[7]  The Weinstein contract served as a model for the owners only in the negotiation of subsidiary terms that were left open in the initial offer of sale.  On the facts of this case, therefore, we rule that the owners did not negotiate in bad faith when they used the Weinstein contract as a basis for rejecting the tenant organization's second contract proposal.[8]  At that point, the tenant organization had a 15–day right of first refusal.  When it did not attempt to exercise that right, the owners were free to proceed with the sale of the apartment building to the Weinsteins.

*Affirmed.*

5. We also reject the tenant organization's contention that the owners have displayed bad faith in not complying with their request for a detailed statement of operating expenses for 1986 and 1987.  D.C.Code § 45–1632(4) (1986 Repl.) requires owners to provide this statement within 7 days upon request, and § 45–1640(2) provides that for every day that owners delay in providing required information, the negotiation period is extended by one day.  In the context of the statute, however, it is clear that the purpose of a statement of operating expenses is to help a tenant organization determine the terms of the contract it will propose.  Because the request in this case came on February 3, after the tenant association had submitted two contracts, the owners' failure to produce the statement did not toll the running of the negotiation period.

6. By non-material terms, we mean terms not listed in the initial offer of sale.  See footnote 2, *supra.*

7. Although the initial offer of sale provided, pursuant to D.C. § 45–1634, that the tenant organization would not be required to deposit more than five percent of the purchase price, and the $25,000 deposit provided for in the Weinstein contract is $250 more than five percent of the $495,000, the difference is *de minimis.*  The tenant organization's first contract proposal also provided for a $25,000 deposit.

8. We note that in this case, even absent the Weinstein contract, the owners had legitimate business reasons to reject the subsidiary terms proposed in both contracts offered by the tenants.