**1836 S STREET TENANTS
ASSOCIATION, INC.,
Appellant,**

v.

**ESTATE OF B. BATTLE, Appellee.**

No. 06–CV–1460.

District of Columbia Court of Appeals.

Argued March 5, 2008.
Decided Feb. 5, 2009.

Eric M. Rome, Washington, for appellant.

Kevin I. Kane, for appellee.

Before RUIZ and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.

GLICKMAN, Associate Judge:

This case concerns a purported contract for the purchase of a rental housing property by a tenants' association. In the association's view, it entered into a binding sales contract when it accepted the initial offer of sale the owner was required to make under the District of Columbia Tenant Opportunity to Purchase Act, or TOPA.[1] Rejecting that view, the Superior Court granted summary judgment to the owner in the association's suit for specific

1. Rental Housing Conversion and Sale Act of 1980, tit. IV, D.C.Code §§ 42–3404.02 *et seq.* (2001).

performance. The tenants' association has appealed. We reverse.

## I.

As of 2004, the housing property in dispute, located at 1836 S Street in Northwest Washington, D.C. ("the Property"), was owned by the Estate of B. Battle ("the Estate"). Of the eight units in the Property available for rent, four were occupied and four vacant. In early September 2004, the Estate decided to sell the Property. To comply with TOPA requirements, the Estate delivered to each of the tenants a document dated September 1, 2004, entitled "Offer of Sale & Tenant Opportunity to Purchase *Without* a Third Party Contract for Housing Accommodations With Five or More Rental Units." This "Offer of Sale" (as we shall refer to it) purported to fulfill the Estate's obligation under TOPA to grant the tenants "an opportunity to purchase" the Property, and to describe the tenants' TOPA rights and responsibilities in connection with that opportunity. The Offer of Sale stated that "[t]he selling price for the accommodation is $1,349,000," and that "[t]he material terms of the sale are as follows: Property to be sold 'as is', all cash at settlement."

Interested in pursuing the Estate's offer, the tenants of the Property organized the 1836 S Street NW Tenants Association, Inc. ("the Association"). The Association was registered with the District of Columbia on September 22, 2004. That same day, the Association's President, Patrick Oot ("Oot"), sent a letter on the Association's behalf to the Estate's agent. The letter bore the heading "Letter of Interest in Purchasing and Acceptance of Offer for Sale" and stated that the Association "hereby accepts the offer of sale" of the Property and "further expresses its interest in purchasing" the Property. Pursuant to TOPA, the letter requested the Estate to provide certain information (e.g., an itemized list of monthly operating expenses, utility consumption rates, and capital expenditures for the two preceding calendar years; a copy of the building floor plan; and any contract with a third party) within seven days "to assist the tenants association in exploring the feasibility of purchasing this property." For every day of delay beyond the seven days, the letter warned, "the period for us to negotiate a contract of sale with you shall be extended one (1) day." In a second letter dated September 23, 2004, and titled "Tenants Association Letter of Acceptance of Offer via Regular Mail and Courtesy Electronic Mail," Oot undertook "to memorialize the contents of both the [A]ssociation's September 22, 2004 correspondence and our meeting with" the Estate's agent. "By [its] letter to you dated September 22, 2004," Oot wrote, "the 1836 S Street NW Tenants Association, Inc. accepted [the Estate's] offer of sale for the property ... dated September 1, 2004." The September 23 letter did not refer to the Association's earlier request for information to determine whether a purchase would be feasible; instead, the letter stated that the Association was "ready, willing, and able" to make a 5% refundable earnest money deposit upon request.[2]

In the meantime, however, on September 17, 2004, the Estate had signed a contract to sell the Property to a third party named Farivar S. Mottaghi ("Mottaghi") for $1.5 million. The "Mottaghi Contract" stated that the sale was "contingent" on the tenants' rights to purchase the Property under District of Columbia

2. TOPA provides that "[t]he owner shall not require the tenant to pay a deposit of more than 5% of the contract sales price in order to make a contract. The deposit is refundable in the event of a good faith failure of the tenant to perform under the contract." D.C.Code § 42–3404.05(b).

law. The Estate furnished the Mottaghi Contract to the Association on September 27–after the Association's letters of September 22 and 23–together with a document entitled "Right of First Refusal Notice for Five or More Rental Unit Housing Accommodations." This notice advised the Association that it would have to match the terms of the Mottaghi Contract, including its $1.5 million purchase price, in order to buy the Property.

No further correspondence was exchanged between the Estate and the Association until January 14, 2005. On that date, the Estate sent a letter to Oot reasserting the validity of the Mottaghi Contract and noting an impending statutory deadline for the consummation of negotiations with the tenants. The Association's counsel responded on February 4 by tendering a contract with a sale price of $1.349 million, reflecting the Association's position that the Estate was bound by the terms set forth in its September 1 Offer of Sale, which the Association had accepted.

The Estate rejected the Association's response as both inadequate and untimely, but allowed it an additional seven days to match the deal with Mottaghi. The Association declined to match and instead sued the Estate on February 22, 2005, in Superior Court. The complaint alleged breach of contract, violation of TOPA, and other causes of action, and sought specific performance of the $1.349 million contract.

In due time, the parties filed cross motions for summary judgment. The Estate denied that it was bound by the Association's acceptance of the terms in its September 1 Offer of Sale. It argued that its only pertinent obligation under TOPA was to negotiate with the tenants' association in good faith for a period of 120 days,

beginning from the date the Association was created, and then to give the Association a further 15 days to match the third-party contract. Because the 120–day period expired on January 20, 2005 (120 days after the Association was registered) without an agreement, and the contract tendered by the Association on February 4 did not match the purchase price in the Mottaghi Contract, the Estate argued that the Association had failed to exercise its TOPA rights in a timely manner and thereby had lost its opportunity to buy the Property. The Association argued, among other things, that a contract of sale was formed as of September 22 or 23, 2004, when it manifested its acceptance of the Estate's September 1 Offer of Sale. The Superior Court rejected the Association's position and agreed with the Estate, to which it awarded summary judgment on January 9, 2006, without opinion.

## II.

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[3] A genuine issue of material fact exists if the record contains "some significant probative evidence . . . so that a reasonable fact-finder could return a verdict for the non-moving party."[4] The propriety of summary judgment in this case turns on whether an enforceable contract was formed by the Estate's September 1 Offer of Sale and the Association's September 22 and 23 letters of acceptance. The parties have disagreed over whether the Offer of Sale was a firm offer that could be accepted to create a binding contract or merely an invitation to the tenants to negotiate over a possible sale of the

3. Super. Ct. Civ. R. 56(c).

4. *Warren v. Medlantic Health Group, Inc.,* 936 A.2d 733, 737 (D.C.2007) (quoting *Lowrey v.* *Glassman,* 908 A.2d 30, 36 (D.C.2006) (internal quotation marks omitted)).

Property, and also over whether the letters of September 22 and 23 constituted an unequivocal acceptance by the Association of the terms of the September 1 Offer of Sale.[5] In granting summary judgment to the Estate, the trial court necessarily determined that the documents unambiguously did *not* form a contract, either because there was no genuine offer or no valid acceptance. Thus, this appeal requires us to decide whether the documents are (at the very least) sufficiently ambiguous that a reasonable trier of fact could find they gave rise to a valid, binding contract.[6] This is a question of law, as to which our review is de novo.[7]

 Documents forming a putative contract are ambiguous if, and only if, they are "reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings."[8] They are not ambiguous if we "can determine [their] meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, [their] meaning depends."[9] In this case, though, the Estate's Offer of Sale purports, on its face, to comply with or implement TOPA. We therefore must construe the document in light of TOPA's requirements,[10] for regardless of the parties' actual, subjective intentions, the ultimate issue is whether, by their choice of language including their invocations of TOPA, they *objectively* manifested a mutual intent to be bound contractually.[11] Ac-

---

5. At oral argument before this Court, the Estate's counsel appeared to concede that an unequivocal acceptance by the Association of the Offer of Sale would have resulted in a binding contract without the necessity for further negotiation, and he declined to withdraw that concession when asked whether he wished to do so. Based on counsel's statements, we reasonably could treat the issue as waived. However, counsel's concession was inconsistent with his position in his brief, and at other points during oral argument, that unqualified acceptance of the Offer of Sale merely would have ensured the Association an opportunity to negotiate a contract within the constraints imposed by TOPA. In the end, we are uncertain whether the Estate's counsel, under the press of judicial interrogation, made an improvident concession that he did not intend. Because of that uncertainty, we have exercised our discretion not to base our decision on the Estate's possible waiver of its position, and instead to decide the issue on its merits.

6. *See, e.g., Howard Univ. v. Best*, 484 A.2d 958, 966 (D.C.1984) ("[I]f a contract is ambiguous, and the evidence supports more than one reasonable interpretation, the interpretation is a question of fact for the jury.").

7. *See Tauber v. Quan*, 938 A.2d 724, 730 (D.C. 2007) ("Whether a contract is ambiguous is a question of law."); *cf. Strass v. Kaiser*

Found. *Health Plan of Mid–Atlantic*, 744 A.2d 1000, 1013–14 (D.C.2000) (holding that reasonable jury could conclude that employer intended to be bound by terms of handbook, which was ambiguous as to whether or not it was a contract).

8. *Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C.2006) (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.1973) (internal quotation marks omitted)).

9. *Id.*

10. *Cf. Beck v. Cont'l Cas. Co. (In re May)*, 936 A.2d 747, 751 (D.C.2007) (noting that fidelity bonds required by statute are to be construed in harmony with the statutory scheme).

11. *See Davis v. Winfield*, 664 A.2d 836, 838 (D.C.1995); *see also DSP Venture Group, Inc. v. Allen*, 830 A.2d 850, 852 (D.C.2003) ("This jurisdiction follows what has been called the 'objective' law of contracts, which generally means that 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.' ").

cordingly, it is germane to ask whether TOPA required the Estate to make a firm offer of sale to its tenants (prior to its acceptance of the Mottaghi Contract). We start our analysis with that threshold question.

## III.

 Explicating TOPA's requirements is an exercise in statutory interpretation. As always, we begin with the statute's "plain language." [12] If the statutory language is unambiguous, we may end there as well.[13] "[A] court should look beyond the ordinary meaning of the words of a statute only where there are persuasive reasons for doing so." [14] We must, of course, read TOPA as a whole and resist any construction of its words that would render part of the statute a nullity.[15] If we do find ambiguity in TOPA's language, the statute itself directs us to resolve it "toward the end of strengthening the legal rights of tenants or tenant organizations to the maximum extent permissible under law." [16]

TOPA extends a panoply of rights to a residential tenant whose landlord proposes to sell the property or discontinue its use as rental housing. The landlord must "give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale." [17] The landlord and tenant must bargain in good faith [18] and the negotiations must be given a reasonable period in which to reach fruition.[19] The tenant also has a right of first refusal on any sale contract the landlord negotiates with a third party.[20] If the landlord fails to comply with TOPA, the tenant may "seek enforcement of any right or provision ... through a civil action in law or equity." [21]

 This case implicates the meaning of the tenant's right to "an opportunity to purchase the [property] at a price and terms which represent a bona fide offer of sale." [22] We previously have addressed the meaning of "bona fide" in that clause, explaining that it "simply requires an objectively good faith, honest offer of sale." [23] The question we have not yet answered definitively is whether TOPA requires the owner to extend a firm offer to the tenant or, as the Estate contends, merely an invitation to negotiate a sale within a reasonable time period. Nonetheless, we think the answer to this question is not in doubt.

 By its express terms, TOPA requires the owner to do more than simply invite the tenant to negotiate. The statute explicitly calls for the owner to furnish the tenant with a written "offer" that includes

12. *Veney v. United States,* 936 A.2d 811, 822 (D.C.2007).

13. *E.g., District of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999).

14. *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 755 (D.C.1983) (en banc) (internal quotation marks omitted).

15. *In re Estate of Phillips,* 532 A.2d 654, 656 (D.C.1987).

16. D.C.Code § 42–3405.11 (2001); *see 1618 Twenty–First Street Tenants' Ass'n, Inc. v. The Phillips Collection,* 829 A.2d 201, 204 (D.C. 2003).

17. D.C.Code § 42–3404.02(a) (Supp.2008). For purposes of this appeal, there do not appear to be any material differences between TOPA as it existed in 2004 and as it exists today.

18. *Id.* § 42–3404.05.

19. *Id.* §§ 42–3404.09,–3404.10,–3404.11.

20. *Id.* § 42–3404.08.

21. *Id.* § 42–3405.03 (2001).

22. *Id.* § 42–3404.02(a).

23. *See 1618 Twenty–First Street Tenants' Ass'n,* 829 A.2d at 206.

("at a minimum") the "asking price and material terms of the sale,"[24] and thereby to give the tenant the "opportunity to purchase at" that price and on those terms.[25] On their face, these requirements appear designed to compel the owner to make a firm offer that is capable of immediate, binding acceptance by the tenant. Closer inspection of the statutory language confirms that reading, for the basic terminology—"offer," "material terms"—is drawn from the common law of contracts. When a legislature borrows common law terms of art in writing legislation, "it presumably knows and adopts the cluster of ideas that were attached to [the] borrowed word."[26] And at common law, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited *and will conclude it.*"[27] In other words, an offer is, by definition, binding on the offeror if it is properly accepted by the offeree. Similar-

ly, at common law the "material terms" are the provisions necessary to create an enforceable contract.[28] A valid "offer" must contain all of the material terms of the bargain,[29] and if such an offer is accepted, the bargain is enforceable even if the parties never reach agreement on the non-material terms.[30] As we have explained, "parties may make an enforceable contract binding them to prepare and execute a subsequent documentary agreement," as long as "agreement shall have been expressed on all essential terms that are to be incorporated in the document."[31] TOPA's requirement that the "material terms" of the sale be included in the offer is strong confirmation that a true offer is intended.

 Our interpretation of the tenant's right to receive a bona fide offer of sale does not render it in conflict with, or redundant of, the right of first refusal also granted by TOPA.[32] Although the owner's

24. D.C.Code § 42–3404.03.

25. *Id.* § 42–3404.02(a).

26. *1618 Twenty–First Street Tenants' Ass'n,* 829 A.2d at 203 (internal quotation marks omitted).

27. RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981) (emphasis added).

28. *See, e.g., Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.,* 940 A.2d 996, 1002–03 (D.C. 2008) (discussing rule that where parties have agreed on material terms, disagreement or continuing negotiation on non-material terms does not render contract unenforceable); *Tauber,* 938 A.2d at 730–31 (holding that default provisions were not material because they did not alter the parties' expectations about how the contract was to be performed, and therefore their omission did not prevent the contract from being binding); *Duffy v. Duffy,* 881 A.2d 630, 634 (D.C.2005) ("In order for a contract to be enforceable, it must be sufficiently definite as to its material terms (which include, e.g., subject matter, ... payment terms, quantity, and duration) that the

promises and performance to be rendered by each party are reasonably certain." (internal quotation marks omitted) (omission in *Duffy* )).

29. *See, e.g., Duffy,* 881 A.2d at 634.

30. *See Eastbanc, Inc.,* 940 A.2d at 1003; *Hackney v. Morelite Constr.,* 418 A.2d 1062, 1068–69 (D.C.1980) ("[T]he mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation ... will not bar a decree for specific performance." (internal quotation marks omitted) (alterations in *Hackney* )).

31. D.C. Area Cmty. Council, Inc. v. Jackson, 385 A.2d 185, 187 (D.C.1978) (brackets and internal quotation marks omitted).

32. *See* D.C.Code § 42–3404.08 ("In addition to any and all other rights specified in this subchapter, a tenant or tenant organization shall also have the right of first refusal during the 15 days after the tenant or tenant organization has received from the owner a valid sales contract to purchase by a third party.").

dual obligations to extend a bona fide offer of sale and to allow its tenant to exercise a right of first refusal may, in some cases, be satisfied simultaneously, they are conceptually and legally "distinct." [33] The right of first refusal does not ripen into the right to receive an offer of sale from the owner unless and until the owner receives an acceptable offer of purchase from a third party.[34] In contrast, the right to receive a bona fide offer affording a genuine "opportunity to purchase" arises whenever the owner proposes to sell the property, demolish the premises, or convert the property to non-rental use-irrespective of the existence of a third-party contract.[35]

To be sure, TOPA envisions that an offer of sale will be followed, when there is tenant interest, by "bargain[ing] in good faith" and a "reasonable period to negotiate a contract of sale." [36] Moreover, where rental properties with fewer than five units are concerned, TOPA specifically provides that interested tenants should respond to the owner's offer of sale with "a written statement of interest" constituting "a clear expression of interest ... to exercise the right to purchase." [37] If the quoted language were taken to imply that the statutorily-required "offer of sale" is subject to the owner's reserved right to bargain over material terms regardless of the tenants' response to the offer, it would mean TOPA does not require a true manifestation by the owner of its willingness to enter into a contract on specified terms. But that is

**33.** *See Green v. Gibson,* 613 A.2d 361, 362 (D.C.1992) ("[A] residential tenant has two distinct sets of rights when an owner decides to sell...."). *But cf. Wallasey Tenants Ass'n, Inc. v. Varner,* 892 A.2d 1135, 1138 (D.C.2006) (suggesting in dicta that the two rights are equivalent).

**34.** *See Mamo v. Skvirsky,* 960 A.2d 595, 600 (D.C.2008); *see also Wallasey Tenants Ass'n,* 892 A.2d at 1138 (" 'A right of first refusal is a conditional option empowering its holder with a preferential right to purchase a property on the same terms offered by or to a bona fide purchaser.' ") (quoting 17 C.J.S. *Contracts* § 56 (2004)). We have construed the right of first refusal granted by TOPA "to require only substantial conformity, rather than absolute identity or perfect match, between the tenant's exercise of the right and the third party offer." *Green,* 613 A.2d at 366; *see also Columbia Plaza Tenants Ass'n v. Antonelli,* 462 A.2d 433, 439–40 (D.C.1983) (recognizing that an owner may have reasonable justification for insisting on differences between an acceptable third party contract and the contract it offers to its tenants); D.C.Code § 42–3404.05(a)(1), (2).

**35.** *See* D.C.Code §§ 42–3404.02(a), 42–3401.03(11) (2001); *see also* D.C.Code § 42–3404.13 (providing that owner seeking to convert from a rental basis to a cooperative must make to each tenant "a bona fide offer to sell such shares or membership interest in the cooperative as will enable the tenant to con-

tinue to reside in his or her unit after conversion"). The right to receive an offer is closer kin to a "right of first offer" than it is to a right of first refusal. A right of first offer, as it usually appears in leases, obligates the owner to offer the property to the lessee before offering it to any third party, and to offer the property to third parties on terms no better than those offered to the grantee. *See, e.g.,* David I. Walker, *Rethinking Rights of First Refusal,* 5 STAN. J.L. BUS. & FIN 1, 10 (1999) (distinguishing right of first offer from right of first refusal). TOPA allows an owner some leeway to offer a reduced price or other more favorable terms to a third party. *See* D.C.Code § 42–3404.05(a–1).

**36.** *See* D.C.Code § 42–3404.05(a) ("The tenant and owner shall bargain in good faith."); *id.* § 42–3404.11(2) ("The owner [offering to sell a housing accommodation of five or more units] shall afford the tenant organization a reasonable period to negotiate a contract of sale ...."); *see also id.* §§ 42–3404.9(2),–3404.10(2) (similarly requiring owners of housing accommodations with fewer than five units to afford tenants a reasonable period of negotiation).

**37.** D.C.Code §§ 42–3404.09(1),–3404.10(1). Comparable language does not appear in § 42–3404.11, the provision applicable to housing accommodations with five or more units.

neither a necessary implication nor a plausible one in view of the express statutory language discussed above. In general, the recipient of an offer of sale may accept it, reject it, make a counteroffer, or do nothing. We think TOPA's provisions for statements of interest, bargaining in good faith, and reasonable periods of negotiation simply reflect the drafters' expectation that interested tenants rarely would respond to offers of sale with immediate, unqualified acceptance of all their material terms (and the drafters' intent that tenants not be pressured to do so). But that does not mean tenants may never simply accept an owner's offer of sale without qualification and thereby conclude a deal. (In addition, of course, even where a tenant does accept the owner's offer, a period of negotiation usually will be necessary to reduce the agreement to a written contract and to settle on non-material provisions.)

We recognize that TOPA does carve out one situation in which a tenant may not be able to "dictate the outcome" by accepting the owner's offer of sale.[38] This situation arises because D.C.Code § 42–3404.10 allows individual tenants of a two-to-four unit property to respond to an owner's offer of sale with competing expressions of interest. When that happens, the statute grants each interested tenant the right to negotiate separately with the owner for a minimum of ninety days.[39] The owner is barred from contracting with any of the competing tenants before the statutory negotiation period has expired for all of them; if the owner were permitted to consummate a sale contract before that time,

it would render the negotiation period for the other tenants "meaningless."[40] The statute further specifies that "[i]f the owner [was] required to negotiate with more than one tenant ..., the owner may decide which contract is more favorable without liability to the other tenants."[41] In other words, the owner's choice of which tenant to contract with (after the conclusion of good faith negotiations) is essentially unfettered—which the Council considered it must be for each tenant's right to negotiate to be meaningful.[42] It follows that, where tenants are competing to purchase a two-to-four unit property, one tenant may not deny other tenants their equal rights to negotiate even by responding to the owner's offer of sale with an unqualified acceptance.

But this restriction is merely incidental to the broader requirements that TOPA imposes on negotiations when (and only when) tenants are in competition. It is not reflective of any limitation inherent in the meaning of the term "offer of sale," or on the ability of a tenant or tenant organization receiving such an offer to accept it under any other circumstances. Where the need to accommodate and honor the rights of competing tenants does not exist, nothing in TOPA prohibits a tenant or tenant organization from accepting an owner's offer of sale and thereby concluding a bargain. And the restriction that applies when tenants compete does not apply in this case, for where a rental accommodation has five or more units, TOPA requires the owner to negotiate only with a duly registered tenant's association, and not with individual tenants or other tenant groups.[43]

38. *Medrano v. Osterman,* 885 A.2d 310, 314 (D.C.2005).

39. D.C.Code § 42–3404.10(2)(A).

40. *Medrano,* 885 A.2d at 311, 313–14.

41. D.C.Code § 42–3404.10(2)(C).

42. *See Medrano,* 885 A.2d at 313–14 (rejecting the assertion that the tenant who offers the highest price is entitled to have his offer accepted; "[a] higher offer is not necessarily a more 'favorable' one, a judgment the Act in any case leaves entirely to the owner, 'without liability to the other tenants' ").

43. *See* D.C.Code § 42–3404.11(1).

It might be objected that our construction of TOPA is contrary to our analysis of the statute in *Lealand Tenants Association v. Johnson.*[44] In *Lealand*, we upheld the owners' right to demand that their tenants agree to terms that were not listed in the owners' initial offer of sale.[45] But we do not construe this holding to mean that tenants who respond to an initial offer of sale with a timely and unqualified acceptance have no enforceable agreement if they subsequently refuse an owner demand for an additional term. Our holding that the tenants in *Lealand* had no enforceable agreement even though they had agreed to the "material terms" in the property owners' initial offer of sale turned, we believe, on the fact that the initial offer was no longer on the table by the time the tenants purported to accept it.

In *Lealand*, the only term designated as "material" in the original offer of sale, in addition to the $495,000 purchase price, was the requirement "that the sale yield all cash to the owners."[46] Pursuant to TOPA, the offer also stated that the tenants would be required to deposit no more than five percent of the purchase price,[47] but the amount of the required deposit was not specified, and the deposit requirement was not designated a "material" term. Before the tenants responded to the initial offer in any way (but during the statutory negotiation period), the owners contingently accepted a third party's contract to buy the property. The third-party contract matched the material terms of the owners' offer to the tenants and, in addition, specifically provided for an earnest money deposit of $25,000.[48] The property owners notified the tenants of their execution of the third-party contract. Thereafter, before their statutory negotiation period expired, the tenants offered the owners a contract matching the initial offer of sale and the third-party contract (including the provision for a $25,000 deposit), but also including a number of new terms. One of the new terms would have "prohibited the owners from entering new leases from the date of ratification to closing;" another would have obligated them "to make every effort" to help the purchasers convert the property to either a condominium or cooperative.[49] The owners objected to the new requirements and rejected the tenants' proposed contract. The tenants then submitted a second contract that omitted the objectionable terms but that provided for an earnest money deposit of only $10,000. Citing the reduction of the deposit from $25,000 to $10,000, the owners rejected the tenants' second proposal too. The tenants then sued to enjoin the third-party sale, contending that it was impermissible for the property owners to require them to meet a term of the third-party contract that had not been a "material term" in the owners' offer of sale to the tenants.

It was in this context that we held that "when a third-party contract is received by the tenant organization after negotiations have begun, it is at least permissible for the owners to ask for subsidiary terms—*i.e.*, non-material terms—similar to those offered by the third party."[50] The critical premise of our holding, we believe, is that the owners' initial offer of sale was no

---

44. 572 A.2d 431 (D.C.1990).

45. *Id.* at 434 & n. 6.

46. *Id.* at 432.

47. *Id.*

48. The $25,000 figure was $250 more than five percent of the purchase price, a difference our opinion characterized as *"de minimis."* *Id.* at 434 n. 7.

49. *Id.* at 432 & n. 3.

50. *Id.* at 434 (footnote omitted). "By non-material terms, we mean[t] terms not listed [as material] in the initial offer of sale." *Id.* at 434 n. 6.

longer extant when the tenants attempted to accept it and when the owners insisted the tenants accede to an additional term. For one thing, by notifying the tenants that they had accepted a contract with a third party, the owners arguably evinced their intent to revoke their previous offer to the tenants before it had been accepted.[51] This is consistent with the requirements of good faith bargaining set forth in TOPA.[52] But regardless of whether the owners effectively revoked their initial offer, the tenants responded to it not with an acceptance, but with a counter-offer,[53] injecting potentially onerous new terms the owners had "legitimate business reasons to reject."[54] The tenants' counter-offer terminated their power to accept the original offer of sale.[55] At that point, we concluded, it did not constitute bad faith negotiation for the owners to use the third-party contract "as a model ... only in the negotiation of subsidiary terms that were left open in the initial offer of sale,"[56] and which the owners initially had not considered material in the usual legal sense. In other words, once negotiations are under way (the tenant not having accepted the owner's opening offer of sale), the owner surely has *some* room to revise its initial assessment of what sale terms are required.[57] To say that much is a far cry

51. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 42 ("An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract."), 43 ("An offeree's power of acceptance is terminated when the offeror takes definite action inconsistent with an intention to enter into the proposed contract and the offeree acquires reliable information to that effect.").

52. TOPA states that "[t]he following constitute prima facie evidence of bargaining without good faith":
(1) The failure of an owner to offer the tenant a price or term at least as favorable as that offered to a third party, within the [statutory negotiation] periods ... without a reasonable justification for so doing;
(2) The failure of an owner to make a contract with the tenant which substantially conforms with the price and terms of a third party contract within the [statutory negotiation] periods ... without a reasonable justification for so doing; or
(3) The intentional failure of a tenant or an owner to comply with the provisions of this subchapter.
D.C.Code § 42–3404.05(a).

53. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 39(1) ("A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer."), 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."). "But a definite and seasonable expression of acceptance is operative despite the statement of additional or different terms if the acceptance is not made to depend on assent to the additional or different terms.... The additional or different terms are then to be construed as proposals for modification of the contract." *Id.* § 59 cmt. a; *see also id.* § 61.

54. *Lealand,* 572 A.2d at 432 & n. 3, 434 n. 8.

55. *See* RESTATEMENT (SECOND) OF CONTRACTS § 39(2) ("An offeree's power of acceptance is terminated by his making of a counter-offer, unless the offeror has manifested a contrary intention or unless the counter-offer manifests a contrary intention of the offeree."); *see also So v. 514 10th Street Assocs., L.P.,* 834 A.2d 910, 913 & n. 1 (D.C.2003).

56. *Lealand,* 572 A.2d at 434; *see also Columbia Plaza,* 462 A.2d at 438 ("If the [tenant's] right to purchase under [TOPA] is to have any meaning, the third party contract must be very close, in its terms and substance, to that which the sellers are willing to accept from the [tenant].").

57. In *Lealand* we left open the question whether or to what extent an owner may in good faith use its receipt of a third-party contract during the negotiation period to demand that the tenant agree to *material* terms that differ substantially from those set forth in the initial offer of sale. *See* 572 A.2d at 434.

from rejecting the basic contractual rule that an offeree's timely, unqualified acceptance of a valid offer results in a binding contract even if non-material terms remain for the parties to address.[58] We are sure that *Lealand* did not mean to reject that rule, *sub silentio,* under TOPA. Nothing in *Lealand* is inconsistent with reading TOPA, as we do, to require the property owner to give the tenants a firm offer of sale—an offer the tenants may accept to make an enforceable bargain.

Because we do not consider TOPA to be ambiguous on this point, we find it unnecessary to rely on the statutory directive to resolve ambiguities in favor of strengthening tenants' legal rights.[59] That said, our interpretation does promote that expressed goal.[60] And though we see no need to consult the legislative history of TOPA to divine the Council's intent, our interpretation comports with the understanding, articulated in the explanatory report of the Council's Committee on Housing and Economic Development, that the offer-of-sale provision "requires the owner prior to sale of the accommodation to a third party to first make a bonafide [sic] offer of sale to the tenants."[61]

With the foregoing discussion as backdrop, we now may turn to a closer examination of the Estate's September 1 Offer of Sale and the Association's two letters in response to that communication.

## IV.

### A. The Offer of Sale

■ The Offer of Sale is set forth in full in the Appendix to this opinion.[62] It appears the Estate based the lengthy document on a form created by the Condominium and Cooperative Conversion and Sales Branch of the District of Columbia Department of Consumer and Regulatory Affairs to help property owners fulfill their obligations under TOPA. Be that as it may, the document is inartfully drafted at best. To begin with, while it characterizes itself in several places as an "offer of sale," [Heading, ¶ 1, ¶ 10, final ¶] it also refers to itself in three places as an "offer of sale notice." [¶¶ 2, 9, 10] An "offer of sale" and an "offer of sale notice" arguably mean different things; the latter term plausibly may be read to support the Estate's contention that the document was not a firm offer capable of immediate acceptance but merely an invitation to negotiate over the

accommodation to the tenant or tenants … [,] continu[ing] the policy of the Council of preventing displacement by giving the tenants an opportunity to purchase their homes." (emphasis added, comma omitted)).

**58.** *See, e.g., Eastbanc, Inc.,* 940 A.2d at 1002–03; *Hackney,* 418 A.2d at 1068–69.

**59.** D.C.Code § 42–3405.11.

**60.** *See also* D.C.Code § 42–3401.02(1) (declaring that one of the Council's "statutory purposes" was "[t]o discourage the displacement of tenants through conversion or sale of rental property, and to strengthen the bargaining position of tenants toward that end without unduly interfering with the rights of property owners to the due process of law").

**61.** Council of the District of Columbia, Committee on Housing and Economic Development, Report on Bill 3–222, Rental Housing Conversion and Sale Act of 1980, at 7 (May 13, 1980); *see also id.* at 5 ("[TOPA] requires [an] owner with an intent to sell his accommodation to a third party *to first offer* the

**62.** The Estate addressed and sent its Offer of Sale letter to each individual tenant residing at the Property, but TOPA provides that once the tenants of an accommodation with five or more units have registered a tenant organization, the owner's prior offer of sale to the tenants is "deemed an offer to the organization." D.C.Code § 42–3404.11(1). In accordance with that provision, the Offer of Sale states that "[a]ny response to this offer to purchase [*sic* ] must be made by a tenant organization." [¶ 2]

terms of a sale. (It does not help matters that the document also describes itself, idiosyncratically, as an "offer to purchase.") [¶ 2]

■ Other language in the Offer of Sale more directly supports the Estate's interpretation. Notably, the paragraph captioned "Settlement Time" states that "[i]f the tenant organization decides to purchase *and the offer is accepted by me,* the tenant organization will have a minimum of one hundred twenty (120) days to secure financing." [¶ 6] Furthermore, the paragraph setting forth the tenant organization's statutory right to 120 days *"to negotiate a sales contract"* also can be read to imply that only an opportunity to negotiate has been extended. [¶ 3] Indeed, after explaining at the outset that "[t]his offer describes your tenant rights and responsibilities and the statutory time periods under the Act [TOPA]," [63] [¶ 1] the document expends significantly more effort informing the tenants of their rights than in laying out the acceptable terms of a sale. A notification of statutory rights is not the same as an offer. Although we hold that TOPA requires an offer in the conventional sense of the term, it is not clear that *this document* was the offer that TOPA required. And if, as the Estate suggests, there was uncertainty or disagreement among landlords and their counsel as to whether TOPA requires a firm offer as opposed to an invitation to negotiate, that lends further support to the Estate's interpretation of the document.[64] Reading the Offer of Sale holistically, a fact finder might be able to conclude that the document is more consistent with an invitation to commence negotiations than with a firm offer.

Nonetheless, the document clearly can be construed as a genuine offer, as the Association contends. The document is entitled an "Offer of Sale & Tenant Opportunity to Purchase," and its very first paragraph begins, "This letter is to advise you of my offer to sell" the Property. Thereafter, despite its terminological inconsistency, the document does, repeatedly, call itself an "offer." On its face, moreover, the document purports to fulfill the Estate's initial obligation under TOPA, which, as we have explained, requires a firm offer. The label alone might not be sufficient to convince a fact finder of the document's substance,[65] but the document also claims to set forth "[t]he material terms of the sale." [¶ 4] The Estate does not argue that the Offer of Sale is insufficiently definite as to its material terms to permit the formation of a contract, and we perceive no fatal deficiency in that regard. As explained above, the fact that additional ("non-material") terms remained open for negotiation would not be enough to preclude an enforceable agreement on the material terms. That the Estate may have been surprised to receive an immediate and unqualified acceptance of its Offer of Sale likewise does not mean the offer was incapable of a binding acceptance.

We conclude that the "Offer of Sale" is ambiguous. On the existing record, its

---

63. TOPA requires any offer of sale to include a summary of tenant rights. *See* D.C.Code § 42–3404.03(2).

64. In assessing the objective meaning of a putative contract, it is appropriate to consider "the circumstances known to the parties at the time of contract formation." *District of Columbia v. D.C. Pub. Serv. Comm'n,* 963 A.2d 1144, 1155 (D.C.2009); *see also Brown v.*

*George Washington Univ.,* 802 A.2d 382, 386 (D.C.2002) (noting that objective theory of contracts requires that "custom and practice ... be taken into account in determining the reasonable expectations of persons in the position of the contracting parties" (internal quotation marks omitted)).

65. *See, e.g., USA Waste of Maryland, Inc. v. Love,* 954 A.2d 1027, 1036 (D.C.2008).

meaning—whether it was a firm offer or only an invitation to negotiate—was not susceptible to resolution as a matter of law on the parties' motions for summary judgment.

### B. The Letters of Acceptance

We next must examine the Association's letters to the Estate purporting to accept the "Offer of Sale." The Estate argues that those letters were equivocal and contradictory. If so, no contract was formed even if the "Offer of Sale" did constitute a true offer.

As previously mentioned, the Association's letter of September 22 bears the heading "Letter of Interest in Purchasing and Acceptance of Offer for Sale" and states that the Association both "accepts the offer of sale" and "further expresses its interest in purchasing" the Property. The letter then characterizes itself as a "statement of interest," requests specified information "to assist the tenants [sic] association in exploring the feasibility of purchasing this property," and alludes to "the period for us to negotiate a contract of sale with you." The Estate reasonably could have been uncertain whether this letter was anything more than a statement of potential interest, an opening salvo in negotiation. Like the "Offer of Sale," the September 22 letter is ambiguous. The following day, however, the Association arguably clarified (or perhaps it would be more accurate to say emended) its intentions. Its letter of September 23, captioned a "Letter of Acceptance of Offer," states categorically that the previous letter

"accepted" the September 1 offer of sale and declares the Association "ready, willing and able to transfer a 5% refundable earnest money deposit upon request." Considering the two letters together, a reasonable fact-finder could readily conclude that, by September 23, the Association conveyed its unequivocal acceptance of the September 1 Offer of Sale. In light of our conclusion that the Offer of Sale is ambiguous, and can be construed either as a firm offer or an invitation to negotiate, we need not decide whether the Association's letters of September 22 and 23, taken together, constituted a valid acceptance as a matter of law.[66]

### V.

For the foregoing reasons, we think there are ambiguities in the Estate's "Offer of Sale" of September 1, 2004, such that a reasonable trier of fact could find that the document conveyed a firm offer and not merely an invitation to negotiate. Similarly, we think a trier of fact could find that the Association accepted that offer by its letters of September 22 and 23, 2004. If those documents, taken together, formed a completed bargain on all material terms, an enforceable contract existed-even if it had yet to be formally memorialized and non-material terms had not yet been hammered out. Consequently, summary judgment was inappropriate. We reverse and remand for further proceedings.

---

**66.** In light of this determination, we do not reach the Estate's argument that the written contract proffered by the Association on February 4, 2005, was untimely. If the Estate wrongfully repudiated an enforceable contract formed as of September 23, 2004, it would seem that the subsequent delay in reducing that agreement to an integrated writing should not be charged to the Association.

We also need not consider at this time the legal consequences if it ultimately is found that the Estate failed to meet its obligation under TOPA to extend a bona fide offer of sale to its tenants. The Association has not pleaded a cause of action based on such a failure; rather, it has alleged that the Estate made a true offer, which was accepted.

APPENDIX

OFFER OF SALE & TENANT OPPORTUNITY TO PURCHASE *WITHOUT* A THIRD PARTY CONTRACT FOR HOUSING ACCOMMODATIONS WITH FIVE OR MORE RENTAL UNITS.

*FIVE OR MORE RENTAL UNITS*

DATE: September 1, 2004

Number of Occupied Rental Units *4*

Number of Vacant Rental Units *4*

COMBINED TOTAL NUMBER OF RENTAL UNITS *8*

Mr. Patrick Oot

[address omitted]

Dear Tracy [sic]:

This letter is to advise you of my offer to sell the 8 unit housing accommodation in which you live located at 1836 S Street, N.W., Washington, D.C., 20009.

1. *OFFER OF SALE*

As a tenant of a housing accommodations [sic] in the District of Columbia, you must be given an opportunity to purchase this accommodation in accordance with the *Title IV of the Rental Housing Conversion and Sale Act 1980,* as amended, DC Law 3–86 (the "Act."). This offer describes your tenant rights and responsibilities and the statutory time periods under the Act.

2. *APPLICATION FOR REGISTRATION*

Any response to this offer to purchase must be made by a tenant organization. Therefore, upon receipt of this Offer of Sale Notice, you and the other tenants in the accommodation, have *forty five (45) days* to organize a tenant organization with the legal capacity to hold real property and deliver a notarized Application for Registration to *me* and the *Condominium and Cooperative Conversion and Sales Branch of the DC Department of Consumer and Regulatory Affairs* (the Conversion and Sales Office). The Application for Registration must include a list of tenant members, which represents the majority of the heads of households in the housing accommodation as of time of registration. In addition, information regarding the elected officers and copies of the articles of Incorporation, certification of incorporation and the bylaws must be included with the Application for Registration.

If a tenant organization exists in a form desired by the tenants, the application for registration must be delivered to the *Conversion and Sales Office* and *me* within *thirty (30) days. If you and the other tenants fail to organized [sic] and deliver the application for registration within the applicable time period, your tenant's rights under this offer to purchase will expire.*

3. *NEGOTIATION*

If a tenant organization submits an application for registration in accordance with the above paragraphs, the tenant organization will have a minimum of *one hundred twenty (120) days* to negotiate a sales contract.

4. *PRICE AND MATERIAL TERMS*

The selling price for the accommodation is *$1,349,000.* The tenant organization must be informed of the type of financial arrangements, if any I will accept at settlement. I may not require that the tenant organization prove financial ability to perform as a prerequisite to entering into a contract. However, in the event the third party contract provides for deferred purchase money financing, I may require the tenant organization prove, prior to settlement, either alone or in conjunction with a third party purchaser before I grant the tenant organization deferred purchase money financing. The material terms of the sale are as follows: *Property to be sold "as is", all cash at settlement.*

5. *DEPOSIT*

At the time of contracting, the tenant organization is required to deposit no more than five (5) percent of the contract price. This deposit, with interest accrued thereon, is refundable in case there is a good faith inability to perform under the contract.

6. *SETTLEMENT TIME*

If the tenant organization decides to purchase and the offer is accepted by *me,* the tenant organization will have a minimum *of one hundred twenty (120) days* to secure financing or financial assistance and go to settlement for the purchase of this accommodation. However if a lending institution or agency estimates that a decision regarding financing of [sic] financial assistance will be made within *two hundred forty (240) days* after the date of contracting, I will provide the tenant organization with an extension of time consistent with the written estimate. If the tenant organization's articles of incorporation provide, by the date of contracting, that the purpose of the tenant organization is to convert the accommodation to *non-profit housing cooperative* with appreciation of share value limited to a maximum of an annual rate of inflation, the tenant organization will have a minimum of *one hundred eighty (180)* days after the date of contracting to secure financing or financial assistance.

7. *INFORMATION*

I will provide the tenant organization with a copy of: 1) a floor plan of the accommodation, if available; 2) an itemized list of monthly operation expenses; 3) utility consumption rates and capital expenditures for each of the *two (2) preceding* calendar years; and 4) the most recent rent roll, listing of tenants and a list of vacant apartments within *seven (7) days* of receiving a written request for the information.

8. *THIRD PARTY CONTRACT AND RIGHT OF FIRST REFUSAL*

As of this date, I have not accepted a third party sales contract on the accommodation. If a tenant organization is formed and registered, and if I accept a third party contract, I will send the tenant organization the Right of First Refusal Notice and a copy of the sales contract. The tenant organization will have an additional *fifteen (15) days* right of the first refusal [sic] to match the third party contract. If a valid Application of Registration is filed, the 15 day right of first refusal time period will commence at the end of the negotiation time period.

9. *NEW OFFER OF SALE*

You will be issued a new Offer of Sale Notice if I sell or sign a contract with a third party purchaser for a price that is more than *10% less* than the price offered to you or for other terms which would constitute bargaining without good faith. In addition, if I have not sold this accommodation within *three hundred sixty days (360)* from the date of this offer of Sale, and, if I still desire to sell the accommodation at that time, I must comply a new with the provisions of the Act.

10. *WAIVER*

You are prohibited from waiving your right to receive this Offer of Sale. However, if you and the other tenants form a tenant organization and comply with the statutory requirements as discussed in this Offer of Sale Notice, the tenant organization may waive any other tenants rights in exchange for any consideration which if [sic] finds acceptable. Any waiver of the rights of a tenant organization must be in writing and signed on behalf of the tenant organization. I will provide the Conversion and Sales Office with a copy of the signed waiver documents.

11. *ASSISTANCE*

If you would like information concerning technical and financial assistance to help you purchase, you may contact the University Legal Services on [telephone number omitted], the DC Department of housing and Community Development's Multi–Family right Purchase Office [telephone number omitted] or the Conversion and Sales Office on [telephone number omitted].

If you have any questions regarding this matter, please call this telephone number [omitted].

**THIS NOTICE IS OFFER OF SALE IS NOT A NOTICE TO VACATE.** [sic]

Sincerely

_____

Owner's *SIGNATURE*

_____

Owner's *PRINTED* Name

_____

Owner's Address, City, State and Zip Code

_____

Owner's Agent's *SIGNATURE*
*[Omitted]*

_____

Owner's Agent's *PRINTED* Name

[Agent's name and address omitted]

cc: 1 copy of Notice and a list of all Tenants to:

District of Columbia Department of Consumer and Regulatory Affairs

Condominium and Cooperative Conversion and Sales Branch

[address and telephone numbers omitted]