# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RCM LS II, LLC,                                                   )
                                                                 )
    Plaintiff,                                   )
                                                                 )
       v.                           )   C.A. No. 9478-VCL
                                                                 )
LINCOLN CIRCLE ASSOCIATES, LLC,                                  )
LINCOLN PARK CENTER ASSOCIATES, LLC,                             )
LINCOLN COMMONS ASSOCIATES, LLC, and                             )
RCM LINCOLN SQUARE, LLC,                                         )
                                                                 )
    Defendants.                                  )

## MEMORANDUM OPINION

Date Submitted:  July 8, 2014
Date Decided:  July 28, 2014

Blake Rohrbacher, Brock E. Czeschin, Andrew J. Peach, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Andrew J. Levander, Neil A. Steiner, Michael H. Park, Joseph S. McFarlane, DECHERT LLP, New York, New York; *Attorneys for Plaintiff.*

Todd C. Schiltz, DRINKER BIDDLE & REATH, LLP, Wilmington, Delaware; Allen V. Farber, Mark H. M. Sosnowsky, DRINKER BIDDLE & REATH, LLP, Washington, District of Columbia; *Attorneys for Defendants.*

**LASTER, Vice Chancellor.**

The plaintiff and the defendants are parties to a Right of First Offer Agreement dated March 8, 2005 (the "ROFO Agreement" or "RA"). If the defendants desire to sell to a third party all or part of the property that is subject to the ROFO Agreement, then the defendants first must send the plaintiff a notice identifying the price and other material terms on which the defendants are willing to sell. The plaintiff then has thirty days to buy on those terms. If the plaintiff passes, the defendants have 225 days to sell the property to a third party for not less than 97% of the consideration specified in the notice.

The defendants believe they have complied with the ROFO Agreement and wish to sell the property to a third party. The plaintiff contends that the defendants failed to comply with the ROFO Agreement and seeks a permanent injunction barring the pending sale. This post-trial decision grants the injunction.

## I. FACTUAL BACKGROUND

A two day trial was held on May 29-30, 2014. It quickly became clear that although the parties to the case are entities, the dispute actually pits Richard Ruben, who controls the plaintiff, against Ralph Dweck, who controls the defendants. Reflecting this reality, this decision frequently refers for convenience to the principals, rather than their entities. The scope of this decision, however, applies only to the entities, and not to Ruben or Dweck in their personal capacities.

It also became clear during trial that Dweck and his family dislike Ruben intensely. At several points in their professional dealings, Dweck has sought to take advantage of Ruben by making statements to him that contained falsehoods or omitted material information, and Dweck admitted on cross-examination that certain of his

1

statements to Ruben were untrue. Perhaps Ruben harbors similar animus towards Dweck, but his actions and the contemporaneous documents do not suggest it. In determining the facts that were proven by a preponderance of the evidence, this decision has placed the greatest weight on Ruben's testimony and the contemporaneous documents.

## A. Ruben Develops The Property And Sells It To Dweck.

In 1993, Ruben purchased the land located at 555 11th Street, NW in Washington, District of Columbia. He began constructing an office building in 1998, and the building opened in 2001. This decision refers to the land and office building together as the "Property."

In 2005, Ruben sold the Property to Dweck for approximately $265 million. The transaction was structured as a like-kind exchange under Section 1031 of the Internal Revenue Code. Ruben used the structure to defer paying taxes on his profits from the sale of the Property. Dweck used the structure to defer paying taxes on his sale of three residential real estate properties.

Dweck purchased the Property through the four Delaware LLCs that are the defendants in this proceeding: Lincoln Circle Associates, LLC; Lincoln Park Center Associates, LLC; Lincoln Commons Associates, LLC, and RCM Lincoln Square, LLC. The ROFO Agreement refers to the entities as the "Owners," which is a convenient term.

Dweck controls the Owners. The parties did not elaborate on the ownership of the Owners, except to note that Ruben beneficially owns a 5% equity interest in the Property through a stake in RCM Lincoln Square. It appears that Dweck and members of his

2

family own interests in the Owners that give them an aggregate equity interest in the Property of approximately 30-50%. The balance is owned by outside investors.

As part of the sale to Dweck, Ruben bargained for the right of first offer memorialized in the ROFO Agreement. Plaintiff RCM LS II, LLC ("RCM II") is a special purpose entity controlled by Ruben that was created and exists solely to hold Ruben's rights under the ROFO Agreement.

Section 1(a)(i) of the ROFO Agreement establishes the basic first-offer obligation:

> If at any time after the date hereof . . . an Owner desires, or all of the Owners desire, to sell the Property or any portion thereof, or an Owner's interest in the Property or any portion thereof, then prior to each Owner or Owners, as the case may be, effecting a sale to a third party (a "Property Sale"), the Owner or Owners, as the case may be, shall first give to RCM II notice thereof (each such notice being, a "Property Offer Notice") . . . .

RA § 1(a)(i). The Property Offer Notice must "state the sale price, closing date . . . , all material economic terms and all other material terms such Owner or Owners would be willing to accept in respect of such sale." *Id.* Once RCM II receives a Property Offer Notice, it has 30 days to accept the offer. *Id.* If RCM II does not timely accept, the Owners have 225 days to "sell and close" the transaction that was the subject of the Property Offer Notice. *Id.* § 1(c)(i). The ultimate sale price cannot be less than 97% of the sale price offered to RCM II, "taking into account the other terms set forth in the Property Offer Notice." *Id.* The ROFO Agreement also provides that if RCM II elects to purchase the Property, then it is obligated to post a deposit equal to 5% "of the cash portion of the sale price set forth in the [Property Offer Notice.]" *Id.* § 1(e)(i).

3

**B.      Dweck Refinances The Property.**

In 2007, Dweck refinanced the Property by borrowing $285 million from Citibank. The loan amount substantially exceeded the balance on the Property's existing mortgage, which enabled the Owners to distribute over $100 million in cash. The term of the loan was ten years, and the Owners would owe significant defeasance fees if the loan was paid off early. Citibank divided the loan into three notes. The first $220 million was allocated to two A-Notes, which were securitized and are serviced by LNR Partners LLC ("LNR"). The remaining $65 million was allocated to a B-Note that Citibank initially retained.

In 2009, Ruben learned that Citibank was interested in selling the B-Note at a discount. He contacted Dweck and suggested they buy it together. Without telling Ruben, Dweck bought it himself. When Ruben asked Dweck about the purchase of the B-Note, Dweck claimed to know nothing about it.

**C.      Dweck Decides To Sell.**

In 2013, the Property's lease with its major tenant was approaching the time for renewal. Ruben had the right to manage the Property under a management agreement, and lease negotiations fell within his bailiwick. Notwithstanding the agreement, Dweck informed Ruben that he would take responsibility for negotiating the lease renewal. During the course of those negotiations, it became clear that the Property would require a major capital investment. Dweck began to think about selling.

To explore a potential sale, Dweck hired Gerald Trainor of Transwestern, a commercial real estate brokerage firm. Trainor contacted numerous parties to gauge their

4

interest in purchasing the Property. Despite the existence of the ROFO Agreement, no one reached out to Ruben.

On December 23, 2013, JP Morgan Investment Management Inc. ("JP Morgan") sent Trainor a letter of intent contemplating a purchase of the Property for $300 million. Dweck was willing to sell at that price, but he needed to structure any transaction in a manner that would allow him to continue deferring taxes on his gains. It was not clear to Dweck that JP Morgan would agree to the aggressive structure that Dweck wanted to use.

With an acceptable price in hand, Trainor suggested to Dweck that he send a Property Offer Notice to Ruben to start the ROFO process. Dweck declined.

**D.    The Rockrose LOI**

On January 6, 2014, Rockrose Development Corp. ("Rockrose") submitted a letter of intent that matched JP Morgan's bid of $300 million for the Property (the "Rockrose LOI"). Perhaps more importantly, Rockrose offered to accommodate Dweck's tax needs. Dweck had done business with Rockrose before, and he liked the idea of a transaction with Rockrose.

In crafting the Rockrose LOI, Rockrose was well aware of the terms of the ROFO Agreement, and the Rockrose LOI addressed how the parties would handle Dweck's obligations. The Rockrose LOI called for Dweck to send Ruben a Property Offer Notice that would specify a price of $308 million, not the $300 million that Dweck was willing to accept. Rockrose and Dweck chose the $308 million number because the ROFO Agreement provided that if Dweck gave Ruben a Property Offer Notice and Ruben passed, then Dweck would have 225 days to sell the Property for not less than 97% of the

price specified in the notice. Rockrose and Dweck re-envisioned this provision as a basis to gross up the price Ruben would have to pay. The Rockrose LOI also provided that if Ruben elected to buy on the terms specified in the Property Offer Notice, then Rockrose would receive $4 million of the incremental $8 million as a termination fee.

The Rockrose LOI bound Dweck to an exclusivity period of thirty days, with a carve-out for actions necessary to comply with the ROFO Agreement. Dweck signed the LOI on January 6, 2014.

Despite having agreed in principle to sell the Property for $300 million, Dweck did not send a Property Offer Notice to Ruben. Instead, on January 7, 2014, Dweck had Trainor mislead Ruben and his employees about why Rockrose would be visiting the Property.

## E. The Interim Agreement

With the Rockrose LOI in hand, Rockrose and Dweck began negotiating definitive transaction documents. One of the issues was how to handle the defeasance fees associated with the prepayment of the mortgage on the Property, which could exceed $40 million. Such a payment made the sale or recapitalization of the Property infeasible, and Dweck was separately negotiating with LNR to obtain a full or partial waiver of the fees. Dweck wanted to condition his obligation to close on LNR waiving the fees, but Rockrose thought that such a condition gave Dweck too much optionality. Rockrose wanted an agreement with "teeth" that would inflict "pain" on Dweck if he did not obtain a timely waiver and close the transaction. 2 Trial Tr. 429 (Trainor).

On February 13, 2014, Rockrose and Dweck resolved their impasse by entering into a side letter agreement (the "Side Letter"). Under the Side Letter, if Dweck did not obtain a waiver within 45 days, then Rockrose could terminate and receive a breakup fee of up to $500,000, depending on the timing of the termination. After 90 days, Rockrose would receive the breakup fee and upside protection if it terminated. The upside protection feature provided that if Dweck sold the Property in 2014 for more than $300 million, Rockrose would receive all of the profits up to a cap of $4 million.

On February 14, 2014, the day after agreeing to the Side Letter, Rockrose and the defendants signed an interim agreement to govern their relationship until the closing of the recapitalization (the "Interim Agreement"). The Interim Agreement restated and expanded on the terms of the Rockrose LOI and incorporated the Side Letter by reference. The Interim Agreement also contemplated that the parties would execute final transaction documents that would remain in escrow until the exercise period under the ROFO Agreement expired.

On February 21, 2014, Rockrose and Dweck executed formal documentation for the recapitalization that included a contribution agreement (the "Rockrose Contribution Agreement"). The Rockrose Contribution Agreement contemplated a three-tier, post-transaction ownership structure, in which the Property would be owned by a newly formed "Owner LLC," which in turn would be wholly owned by a newly formed "Mezz LLC," which in turn would be wholly owned by a newly formed "RR LLC." The Owners would contribute the Property to Owner LLC for what initially would be 100% of the member units of RR LLC. Rockrose then would purchase a 98% member interest

7

in RR LLC. Dweck believed this structure would enable him to claim, for tax purposes, that he had not sold the Property and therefore did not have to recognize any gains.

As earnest money, the Rockrose Contribution Agreement called for Rockrose to provide a non-refundable $12 million deposit. But under the terms of another side letter, Rockrose only had to pay $6 million on signing. The other $6 million would not be paid unless Dweck waived his right not to close without a waiver of the defeasance fees.

## F.    Dweck Sends The Property Offer Notice.

On February 25, 2014, Dweck sent the Property Offer Notice called for by the ROFO Agreement. Dweck had decided to sell for $300 million over two months earlier, when he received the JP Morgan LOI on December 23, 2013. He had decided to sell to Rockrose for $300 million some seven weeks earlier, when he signed the Rockrose LOI on January 6, 2014. He had signed the Interim Agreement with Rockrose eleven days earlier, on February 14, and the final transaction documents for the Rockrose deal four days earlier, on February 21.

The Property Offer Notice attached over 1,000 pages of exhibits and stated that the Owners were willing to sell the Property for $308 million on the terms set forth in the attachments. The Property Offer Notice stated that RCM II would have thirty days to accept the offer and, if it chose to do so, would need to provide a deposit of $15.4 million.

The Property Offer Notice did not mention Rockrose or provide copies of the Rockrose LOI, the Interim Agreement, the Side Letter, or the Rockrose Contribution Agreement. The Property Offer Notice did not mention that Dweck had agreed to a

8

similar transaction with Rockrose for $300 million or that Rockrose only was required to provide a $6 million deposit. The exhibits nevertheless included agreements modeled on the Rockrose agreements. One agreement was a proposed contribution agreement that called for the same three-tier, post-transaction ownership structure contemplated by the Rockrose Contribution Agreement. A second agreement was a proposed operating agreement for Newco LLC, which was the top-level LLC analogous to RR LLC.

The versions of the agreements provided with the Property Offer Notice created ambiguity about whether RCM II could be forced to close and bear the defeasance fees. The attached version of the contribution agreement provided expressly that Dweck's obligation to close was conditioned on a waiver of the defeasance fees, but did not contain a similar condition for RCM II. The attached version of the operating agreement defined the term "Dweck Liabilities" as including all costs associated with paying off the existing loan on the Property, which would include any defeasance fees. The operating agreement also called for RCM II to make an initial capital contribution in an amount equal to the Dweck Liabilities plus certain other amounts. Read together, the agreements suggested that if RCM II exercised its right to buy, then Dweck could force RCM II to close and make RCM II responsible for contributing enough capital to Newco to pay off the existing mortgage, including the defeasance fees.

## G. RCM II Objects To The Property Offer Notice.

On March 12, 2014, Reuben sent a letter to Dweck disputing the effectiveness of the Property Offer Notice. Ruben advanced four major objections.

9

First, Ruben observed that because of the interrelationship between the contribution agreement and the operating agreement, it was impossible to determine whether RCM II's cash outlay was capped at $308 million or whether RCM II could also be forced to cover the defeasance fees.

Second, Ruben objected that the Property Offer Notice was invalid because the Owners were not making an unqualified offer. Ruben asserted that conditions to Dweck's obligations to close, including the requirement that LNR waive the defeasance fees, rendered the offer illusory.

Third, Ruben objected that if the proposed transaction were accepted, then the Owners would breach other agreements upon closing. The operating agreement for RCM Lincoln Square limited the entity to holding interests in real estate, but if the transaction closed, it would own member interests in Newco, resulting in a breach. The contribution agreement also called for Ruben's management agreement to terminate on closing, which Ruben believed was inconsistent with the terms of that agreement.

Fourth, Ruben objected that the Property Offer Notice failed to disclose all material terms of the proposed transaction. In support of this objection, Ruben pointed to the numerous blanks contained in the proposed governing documents and the omission of key documents, including the subordinate loan documents and the operating agreement for Mezz LLC. Discovery would reveal that the Property Offer Notice failed to disclose other material terms, such as those set forth in the side letters.

Based on these objections, RCM II asserted that the Property Offer Notice was invalid, and RCM II refused to accept or reject the purported offer contained therein.

10

On March 18, 2014, Dweck responded to Ruben with a letter that failed to provide any information beyond what was in the Property Offer Notice. In response to Ruben's objection that the price was indeterminate, Dweck stated that the offer price was $308 million and that the existing loan would be paid off at closing, but he said nothing about whether RCM II could be made to bear related liabilities, such as the defeasance fees. Dweck responded to Ruben's other objections by asserting that (i) the offer did not have to be unqualified, (ii) all material terms had been provided, and (iii) the proposed transaction would not violate existing agreements. Dweck's letter was not a meaningful response. It was argumentative and conclusory.

## H.    RCM II Explores A Potential Transaction.

Despite objecting to the Property Offer Notice, Ruben began searching for partners to finance a purchase of the Property on the terms set forth in the Property Offer Notice. Dweck has contended that Ruben's efforts show that he understood the terms of the deal and that his objections were pretexts. Ruben testified credibly at trial that he was trying to protect himself by proceeding down two tracks. Although Ruben believed the Property Offer Notice was invalid, he wanted to be in a position to proceed with a business deal if it was feasible to do so.

When Ruben solicited investors for the Property, he described the price to his potential partners as between $305 and $310 million. Ruben did not discuss the potential liability for over $40 million defeasance fees. Although Dweck claims this shows that the Ruben was not confused about the price, Ruben testified credibly that he proceeded in this manner because the deal was a non-starter unless the defeasance fees were waived.

11

Ruben objected to the Property Offer Notice because he needed to know if the defeasance fees represented a potential liability. But if they turned out to be a potential liability, then he would not proceed with the deal under any circumstances. Ruben never discussed the defeasance fees with his potential partners, because there would not be any deal if they were included.

Ultimately, Ruben was unable to find a party willing to invest at the $308 million price stated in the Property Offer Notice. Of course, JP Morgan and Rockrose were not interested at $308 million either. They both topped out at $300 million. There are some indications that Ruben could have found investors at that price.

## I.     This Litigation

On March 27, 2014, the day before the Property Offer Notice expired, RCM II filed its complaint in this action. Along with the complaint, RCM II moved for expedited proceedings and sought a temporary restraining order. After some procedural maneuvering, the parties agreed to proceed to trial on a sixty-day schedule. In the meantime, the defendants committed not to close without giving the plaintiff at least ten days' notice, which would permit the plaintiff to renew its TRO application.

## II.     LEGAL ANALYSIS

RCM II seeks a permanent injunction barring the Owners from selling the Property without complying with the ROFO Agreement. To earn this relief, RCM II must establish (i) an actual breach of the ROFO Agreement, (ii) irreparable harm absent the issuance of a permanent injunction, and (iii) that a balancing of the equities favors

12

injunctive relief. *See Sierra Club v. Del. Dep't of Natural Res. & Envtl. Control*, 919 A.2d 547, 555 (Del. 2007).

## A.     Breach Of The ROFO Agreement

To obtain a permanent injunction, RCM II must succeed on the merits of its claim. In this case, that means establishing a breach of the ROFO Agreement. RCM II carried its burden at trial.

### 1.     The Legal Standard

The ROFO Agreement is governed by the laws of the District of Columbia. RA § 13. Under District of Columbia law, "[t]he first step in interpreting a contract is to determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009). The contract "must be interpreted as a whole" and its meaning ascertained "in light of all the circumstances surrounding the parties at the time the contract was made." *Id.* The "reasonable person" interpreting a contract is "bound by usages of the terms which either party knows or has reason to know." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006).

"Extrinsic evidence may be used to determine the circumstances surrounding the making of the contract, however, it may not be relied upon to show the subjective intent of the parties absent ambiguity in the contract's language." *Debnam*, 976 A.2d at 197 (internal quotation marks omitted). "If a contract is reasonably or fairly susceptible to different constructions or interpretations, it is ambiguous." *Id.* "In determining whether a contract is ambiguous, we examine the document on its face, giving the language used

13

its plain meaning." *Id.* "If the court determines that the contract is unambiguous, it should rely on the contract's terms to provide the best objective manifestation of the parties' intent." *Id.* (internal quotation marks omitted).

## 2. The Property Offer Notice Did Not Constitute A First Offer.

The Owners breached the ROFO Agreement by failing to comply with the "first offer" requirement. Under the ROFO Agreement, once Dweck decided to sell the Property for $300 million, he was obligated to "first give to RCM II notice thereof." RA § 1(a)(i). Dweck made the decision to sell at least as early as January 6, 2014, when he signed the Rockrose LOI. Rather than offering the Property to Ruben at that price, Dweck entered into the Interim Agreement and the Side Letter with Rockrose, negotiated and executed definitive transaction documents, and then finally sent the Property Offer Notice on February 25.

In the real estate industry, "[a] right of first offer . . . obligates the owner to offer the property to the [right-holder] before offering it to any third party."[1] A right of first offer is distinct from the similarly named right of first refusal. The key difference between the two is when the right is activated. "A right of first refusal is triggered when a seller of an asset subject to such right has agreed to sell the asset to a third-party buyer." Kahan, *supra*, at 332. "The holder of a right of first refusal then has the option to

---

[1] *1836 S Street Tenants Ass'n, Inc. v. Battle*, 965 A.2d 832, 840 n.35 (D.C. 2009) (citing David I. Walker, *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 10 (1999)); *see also* Marcel Kahan et al., *First-Purchase Rights: Rights of First Refusal and Rights of First Offer*, 14 Am. L. & Econ. Rev. 331, 332 (2012) ("A right of first offer requires a seller who wishes to sell an asset, subject to such right, to offer the right-holder to buy that asset before it is offered to other potential buyers.").

14

purchase the asset on the same terms as those accepted by the third-party buyer." *Id.* Thus, a right of first refusal allows a property owner to negotiate a sale with a third party, subject to the right-holder's "right to match the terms of and preempt any sale of the property negotiated between the owner and a potential third-party buyer." Walker, *supra*, at 8. A right of first offer, in contrast, prohibits the owner from negotiating a transaction with a third party until the property has been offered to the right-holder. If the right-holder elects not to purchase the property, however, then the owner is free to dispose of the property as it sees fit, subject only to any restrictions contained in the right of first offer agreement.

Dweck is a sophisticated real estate investor who is charged with understanding the meaning of the term "right of first offer." Under the plain language of the ROFO Agreement, once Dweck had decided to sell, he was obligated to "first give to RCM II notice thereof." RA § 1(a)(i).

When Dweck decided to sell presents a question of fact. Dweck was entitled to test the market to inform himself about whether to sell and on what terms. He could explore potential transactions and possible structures with third parties. But once he decided to sell the Property and knew the price and structure, Dweck was obligated to send the Property Offer Notice before proceeding further with a third party. In this case, Dweck had made the decision to sell the Property by January 6, 2014. He breached the ROFO Agreement by not sending the Property Offer Notice at that point.

To avoid this result, Dweck claims that the ROFO Agreement only obligated him to send a Property Offer Notice before closing a transaction with a third party. Dweck

relies on Section 1(a)(i), which states that "prior to each Owner or Owners, as the case may be, effecting a sale to a third party . . . , the Owner or Owners, as the case may be, shall first give to RCM II notice thereof." RA § 1(a)(i). Dweck interprets "effecting" to mean "closing." That reading, however, is contrary to the requirement that the Property *first* be offered to RCM. Indeed, as the defendants' conduct illustrates, their proposed reading would make the offer to RCM the *last* step in the sale process. Such an interpretation also would turn Ruben's right of first *offer* into a disadvantaged right of first *refusal*, because Dweck could already have a deal in hand, then offer the Property to Ruben on worse terms.

Dweck's reading of the term "effecting" as synonymous with "closing" is also overly narrow, because it ignores other sections of the ROFO Agreement that actually use the term "close." *See, e.g.*, RA § 1(c)(i). The fact that the parties knew how to refer to closing when they wanted to implies that they used the term "effecting" to mean something more. *See Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (explaining that omission of a term in a contract "speaks volumes" when compared to included terms); *cf. Unkelsbee v. Homestead Fire Ins. Co. of Balt.*, 41 A.2d 168, 172 (D.C. 1945) (discussing application of the *expressio unius est exclusio alterius* doctrine in the contract interpretation context). Although the concept of "effecting" could be synonymous with "closing" in other contexts, when the ROFO Agreement is read as a whole, its meaning is more consistent with the dictionary definition of "bring[ing] about." *Black's Law Dictionary* 592 (9th ed. 2009).

16

Under the terms of the ROFO Agreement, the Owners were obligated to send Ruben a Property Offer Notice first, before taking substantial steps to bring about a transaction with Rockrose. Dweck breached the ROFO Agreement by failing to give Ruben notice first and by taking virtually every step to conclude a transaction with Rockrose short of closing before sending the Property Offer Notice.

### 3. The Property Offer Notice Failed To Specify Material Terms.

The Owners separately breached the ROFO Agreement by failing to specify material terms of the transaction in the Property Offer Notice. Most obviously, the Property Offer Notice failed to state accurately the price at which Dweck was willing to sell. The correct price was $300 million, the price established by the Rockrose LOI, not the grossed-up price of $308 million specified in the Property Offer Notice. The ROFO Agreement also failed to include other material terms, such as the termination rights, related fees, and upside protection set out in the Side Letter.

The ROFO Agreement states that a Property Offer Notice must "state the sale price, . . . all material economic terms and all other material terms such Owner or Owners would be willing to accept in respect of such sale." RA § 1(a)(i). The defendants argue that this language only requires them to offer the Property to RCM II on the terms they would be willing to accept from RCM II, even if they would be willing to accept less favorable terms from a third party.

The text of the ROFO Agreement does not restrict the "would be willing to accept" language to a transaction with RCM II. The text refers to what the Owners

17

would be willing to accept "in respect of such sale," which refers back to the earlier concept of a "Property Sale." That term is defined in the following sentence:

> If at any time after the date hereof . . . an Owner desires, or all of the Owners desire, to sell the Property or any portion thereof, or an Owner's interest in the Property or any portion thereof, then prior to each Owner or Owners, as the case may be, effecting a sale to a third party (a "Property Sale"), the Owner or Owners, as the case may be, shall first give to RCM II notice thereof (each such notice being, a "Property Offer Notice") . . . .

*Id.* The terms of the referent sale are the terms of a sale to the third party.

The plain language of the ROFO Agreement is thus consistent with its purpose, which is to give RCM II the right to be offered the Property *before* it is offered to third parties, on terms equivalent to those that Dweck would offer to third parties. If Dweck could offer the Property to RCM II on special, Ruben-only terms, then RCM II's rights under the ROFO Agreement could easily be frustrated. Although Section 1(c)(i) of the ROFO Agreement provides some protection by preventing Dweck from selling to a third party at a price "less than ninety-seven percent (97%) of the sale price taking into account the other terms set forth in the Property Offer Notice," Dweck's interpretation still would enable Dweck to offer Ruben worse-than-market terms. The more natural reading of the ROFO Agreement is that Dweck was required to offer the Property to RCM II on the same terms that he was willing to accept in a third party sale. Under this reading, the 97% provision gives Dweck some flexibility if Ruben declines and Dweck cannot find a buyer at that price, or if market conditions shift during the 225-day sale period. In either circumstance, Dweck can lower his price to 97% of the price offered to Ruben in order to obtain a sale, but otherwise he has to return to Ruben and restart the ROFO process.

18

Under the terms of the ROFO Agreement, the Owners were obligated to offer the Property to RCM II at $300 million, the same price that they were willing to accept from a third party. They were not permitted to offer the Property to RCM II for $308 million, representing approximately 103% of the price they actually were willing to accept. By misstating the price, the Owners breached the ROFO Agreement.

The Owners also breached the ROFO Agreement by failing to offer the Property to Ruben on terms that included the termination rights, associated fees, and upside protection set out in the Side Letter. The evidence at trial established that these provisions were material in the context of the transaction, because they gave Dweck a powerful incentive to obtain a waiver of the defeasance fees in timely fashion. The Property Offer Notice did not offer the same terms to Ruben, who did not learn about the existence of the Side Letter until this litigation.

### 4. The Property Offer Notice Specified The Wrong Deposit.

The Owners also breached the ROFO Agreement by specifying the wrong deposit amount. Under the terms of the ROFO Agreement, if RCM II elects to accept an offer contained in a Property Offer Notice, it must deliver a deposit "in an amount equal to five percent (5%) of the cash portion of the sale price." RA § 1(e)(i). The term "cash portion" is not defined in the ROFO Agreement. At trial, both Dweck and Craig Deitelzweig of Rockrose acknowledged that the term "cash" in the real estate industry refers to the equity component of the transaction being funded by the buyer, rather than the overall purchase price that includes an amount financed by debt. *See* 2 Trial Tr. 360-62; *id.* at 470-71. Deitelzweig confirmed that the phrase "cash portion" generally refers

to the difference between the overall purchase price and the amount of debt financing. *Id.* at 471.

In this case, Dweck was willing to sell for $300 million in a transaction in which at least $180 million of debt would, at Dweck's insistence, remain outstanding. The cash portion should have been, at most, 5% of $120 million, or $6 million. Not by coincidence, this was the amount of the deposit that Rockrose paid. Although the Rockrose Contribution Agreement was drafted to make it appear that Rockrose paid a deposit of $12 million, only $6 million was due at signing, with the other $6 million only due if Dweck waived the condition that LNR waive the defeasance fees. By specifying a deposit of $15.4 million in the Property Offer Notice, the Owners breached the ROFO Agreement.

## B. Irreparable Harm

To obtain a permanent injunction, RCM II also must show irreparable harm. District of Columbia law recognizes that real property is unique, such that the loss of an opportunity to purchase real property constitutes irreparable harm. *See Peterson v. D.C. Lottery & Charitable Games Control Bd.*, 1994 WL 413357, at *4 (D.D.C. July 28, 1994) ("It is settled beyond the need for citation . . . that a given piece of property is considered to be unique, and its loss is always an irreparable injury." (quoting *United Church of the Medical Ctr. v. Medical Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982))). The defendants, to their credit, have not contested this point.

## C. The Balance Of Equities

The final element required for the issuance of a permanent injunction is for the balance of the equities to favor injunctive relief. The Owners argue that the equities tip in their favor because RCM II already had an opportunity to market the Property and because a delay in closing the transaction could jeopardize lease renewal negotiations with the Property's primary tenant. Neither concern outweighs the irreparable harm that RCM II will suffer if its rights are not respected.

Although the Owners are correct that RCM II attempted to market the Property, they fail to recognize that Ruben did so based on a price of $305 to $310 million, rather than a price of $300 million. Uncontroverted testimony at trial established that the difference would be material to a prospective buyer. Ruben also did not receive the benefit of other material terms, such as those set forth in the Side Letter, and he was forced to attempt to market the property without Dweck clarifying ambiguities in the proposed transaction documents. RCM II has not had the opportunity to which it was entitled under the ROFO Agreement.

The Owners' argument about the threat to the lease negotiations with the Property's major tenant is unconvincing. To the extent a risk to the lease negotiations exists, it was largely of the Owners making. Dweck chose to wait until the last possible moment—indeed, beyond the last permissible moment—to begin the ROFO process. He cannot now complain about delay that could have been avoided had he acted in timely fashion.

The balance of the equities favors injunctive relief.

### III. CONCLUSION

The Property Offer Notice did not comply with the ROFO Agreement. The defendants are permanently enjoined from proceeding with the current transaction with Rockrose that purportedly was the subject of the Property Offer Notice. To the extent the Owners wish to sell the Property, they must start the process over by issuing a notice that complies with the ROFO Agreement. The plaintiff shall submit a form of implementing order that enters judgment in favor of the plaintiff on its claims and against the defendants on their counterclaims.